**CAPITOL BODY SHOP, INC.,**                                                    **PLAINTIFFS**

**VS.**                                                    **Cause No.** 6:14-CV-6000-Orl-31TBS
                                                                   Mississippi Action

**STATE FARM MUTUAL AUTOMOBILE**
    **INSURANCE COMPANY, ET AL**                                  **DEFENDANTS**

---

### PLAINTIFFS' SECOND AMENDED COMPLAINT

### JURY TRIAL DEMANDED

---

COME NOW, the above-captioned Plaintiffs, pursuant to the Federal Rules of Civil Procedure and other applicable authority and file this, their Complaint against the above-captioned Defendants, and in support thereof, state the following:

For clarity and ease of reference, Plaintiffs note the following changes to the parties occur with this filing:

1.      Plaintiff Roy Rogers Body Shop, Inc., has been deleted as a Plaintiff.

2.      Plaintiff AutoWorks Collision Specialist, LLP, has been added as a Plaintiff.

### PARTIES

3.      Plaintiff Capitol Body Shop, Inc., is a Mississippi corporation authorized to do business and is doing business at 102 Raymond Road, Jackson, Mississippi 39204.

4.      Plaintiff Automotive Alignment & Body Service, Inc., is a Mississippi Corporation registered to do business and is doing business as Pitalo Auto Paint & Body at 2311 Government St., Ocean Springs, Mississippi 39564.

5.     Plaintiff Alexander Body Shop, LLC, is a Mississippi limited liability company registered to do business and is doing business at 618 Highway 61 N., Natchez, Mississippi 39120.

6.     Plaintiff AutoWorks Collision Specialist, LLP, is a Mississippi limited liability partnership authorized to do business and is doing business at 113A Briarwood Drive, Jackson, Mississippi, 39206.

7.     Plaintiff B & W Body Shop, Inc., is a Mississippi corporation authorized to do business and is doing business at 1650 Bush Dairy Road, Laurel, Mississippi 39440.

8.     Plaintiff Bill Fowler's Bodyworks, Inc., is a Mississippi corporation authorized to do business and is doing business at 8610 Highway 51 North, Southaven Mississippi 38671.

9.     Plaintiff Bolden Body Shop, LLC, is a Mississippi limited liability company registered to do business and is doing business at 649 North Mill St., Jackson, Mississippi 39202.

10.     Plaintiff Canton Collision, LLC, is a Mississippi limited liability company registered to do business and is doing business at 1019 E. Peace Street, Canton, Mississippi 39046.

11.     Plaintiff Capitol Body Shop of Ridgeland, Inc., is a Mississippi corporation authorized to do business and is doing business at 209 Sunnybrook Road, Ridgeland, Mississippi 39157.

12.     Plaintiff Capitol Body Shop of Byram, Inc., is a Mississippi corporation authorized to do business and is doing business at 7507 Siwell Road, Byram, Mississippi 39272.

13.     Plaintiff Clinton Body Shop, Inc., is a Mississippi corporation authorized to do business and is doing business at 1115 North Monroe Street, Clinton, Mississippi 39056.

14.     Plaintiff Clinton Body Shop of Richland, Inc., is a Mississippi corporation authorized to do business and is doing business at 710 Highway 49 South, Richland, Mississippi 39218.

15.     Plaintiff Crystal Car Care, Inc., Is a Mississippi Corporation authorized to do business and is doing business at 25080 A Highway 51, Crystal Springs, Mississippi 39059.

16.     Plaintiff East McComb Body Shop, Inc., is a Mississippi Corporation authorized to do business and is doing business at 501 Pearl River Avenue, McComb, Mississippi 39648.

17.     Plaintiff George Carr Buick Pontiac Cadillac GMC, Inc., is a Mississippi corporation authorized to do business and is doing business at 2950 S. Frontage Road, Vicksburg, Mississippi 39180.

18.     Plaintiff Hypercolor Automotive Reconditioning, LLP, is a Mississippi limited liability partnership authorized to do business and is doing business as Autoworks Collision Specialists, LLP, at 113A Briarwood Dr., Jackson, Mississippi 39206.

19.     Plaintiff Lakeshore Body Shop, Inc., Is a Mississippi corporation authorized to do business and is doing business at 5445 Lower Bay Road, Bay St. Louis, Mississippi 39520.

20.     Plaintiff Patriot Auto Body, LLC, is a Mississippi limited liability company authorized to do business and is doing business act 1114 West Government Street, Brandon, Mississippi 39042.

21.     Plaintiff Porter's Body Shop, Inc., Is a Mississippi corporation authorized to do business and is doing business at 211 Hartman Street, Brookhaven, Mississippi 39601.

22.     Plaintiff ProTouch Collision, LLC, is a Mississippi limited liability company, authorized to do business and is doing business as Boler-Phillips at 4625 Highway 80 E., Pearl,

Mississippi 39208.

23.     Plaintiff Roy Rogers Body Shop, Inc., is a Mississippi corporation authorized to do business and is doing business at 3066 Old Amy Road, Laurel, Mississippi 39443.

24.     Plaintiff Smith Brothers Body Shop, Inc., is a Mississippi corporation authorized to do business and is doing business at 521 S. Farish Street, Jackson, Mississippi 39201.

25.     Plaintiff Smith Brothers Collision Center, Inc., is a Mississippi corporation authorized to do business and is doing business at 112 East Presley Boulevard, McComb, Mississippi 39648, and 325 Brookhaven Street, Brookhaven, Mississippi, 396041.

26.     Plaintiff Walkers Collision Center, Inc., is a Mississippi corporation authorized to do business and is doing business at 1003 Highway 11 South, Picayune, Mississippi 39466.

27.     Plaintiffs Mark Cook and Barry Lewis, individually and as a partnership doing business as European Coachworks, Ltd., at 212 Industrial Drive, Ridgeland, Mississippi 39157.

28.     Plaintiff Hardin's, Inc., d/b/a Hardin's Body Shop, is a Mississippi corporation authorized to do business and is doing business at 1012 Lehmberg Road, Columbus, Mississippi 39704.

29.     Plaintiff Richie's Collision Center, LLC, is a Mississippi limited liability company authorized to do business and is doing business at 29 Huckleberry Drive, Hattiesburg, Mississippi 39402.

30.     Plaintiff Quality Body Shop, Inc., is a Mississippi corporation authorized to do business and is doing business at 359 Raceway Road, Greenville, Mississippi 38203.

31.     Defendant State Farm Mutual Automobile Insurance Company is a mutual company registered with the Mississippi Department of Insurance to do business within the state

of Mississippi whose headquarters is located at One State Farm Plaza, Bloomington, Illinois 61710. This defendant may be served through its designated agent for service of process, Mr. John Langcuster, 1107 Highland Colony Parkway, Suite 219, Ridgeland MS 39157.

32.     Defendant State Farm Fire and Casualty Company is an insurance company registered with the Mississippi Department of Insurance to do business within the state of Mississippi whose headquarters is located at One State Farm Plaza, Bloomington, Illinois 61710. This defendant may be served through its designated agent for service of process, Mr. John Langcuster, 1107 Highland Colony Parkway, Suite 219, Ridgeland MS 39157.

33.     Defendant Progressive Gulf Insurance Company is an insurance company registered with the Mississippi Department of Insurance to do business within the state of Mississippi whose headquarters is located at 6300 Wilson Mills Road W33, Mayfield Village, Ohio 44143. This defendant may be served through its designated agent for service of process, CT Corporation System of Mississippi, 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

34.     Defendant Progressive Casualty Insurance Company is an insurance company registered with the Mississippi Department of Insurance to do business within the state of Mississippi whose headquarters is located at 6300 Wilson Mills Road W33, Mayfield Village, Ohio 44143. This defendant may be served through its designated agent for service of process, CT Corporation System of Mississippi, 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

35.     Defendants Allstate Property and Casualty Insurance Company is an insurance company registered with Mississippi Department of Insurance to do business within the state of

Mississippi and whose headquarters is located at 2775 Sanders Road, Northbrook, Illinois 60062. This defendant may be served through its designated agent for service of process, CT Corporation System of Mississippi, 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

36.     Defendant Allstate Insurance Company is an insurance company registered with Mississippi Department of Insurance to do business within the state of Mississippi and whose headquarters is located at 2775 Sanders Road, Northbrook, Illinois 60062.  This defendant may be served through its designated agent for service of process, CT Corporation System of Mississippi, 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

37.     Defendants Nationwide Property and Casualty Insurance Company is an insurance company registered with the Mississippi Department of Insurance to and is do business within the state of Mississippi whose corporate headquarters is located at One West Nationwide Boulevard, Columbus, Ohio 43215.  This defendant may be served through its designated agent for service of process, CT Corporation System of Mississippi, 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

38.     Defendant Nationwide Mutual Insurance Company is a mutual insurance company registered with the Mississippi Department of Insurance to and is doing business within the state of Mississippi corporate headquarters is located at One West Nationwide Boulevard, Columbus, Ohio 43215.  This defendant may be served through its designated agent for service of process, CT Corporation System of Mississippi, 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

39.     Defendant GEICO General Insurance Company is an insurance company

registered with the Mississippi Department of Insurance to do business and is doing business within the state of Mississippi whose corporate headquarters is located at 5260 Western Avenue, Chevy Chase, Maryland 20815.  This defendant may be served through its designated agent for service of process, CT Corporation System of Mississippi, 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

40.     Defendant GEICO Indemnity Company  is an insurance company registered with the Mississippi Department of Insurance to do business and is doing business within the state of Mississippi whose corporate headquarters is located at 5260 Western Avenue, Chevy Chase, Maryland 20815.  This defendant may be served through its designated agent for service of process, CT Corporation System of Mississippi, 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

41.     Defendant United Services Automobile Association is an insurance company registered with the Mississippi Department of Insurance to do business and is doing business within the state of Mississippi whose corporate headquarters is located 9800 Fredericksburg Road, San Antonio, TX 78288. This defendant may be served through its designated agent for service of process, CT Corporation System of Mississippi, 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

42.     Defendant USAA Casualty Insurance Company is an insurance company registered with the Mississippi Department of Insurance to do business in and is doing business within the state of Mississippi whose corporate headquarters is located 9800 Fredericksburg Road, San Antonio, TX 78288. This defendant may be served through its designated agent for service of process, CT Corporation System of Mississippi, 645 Lakeland East Dr., Suite 101,

Flowood, Mississippi 39232.

      43.    Defendant USAA General Indemnity Company is an insurance company registered with the Mississippi Department of Insurance to do business in and is doing business within the state of Mississippi whose corporate headquarters is located 9800 Fredericksburg Road, San Antonio, TX 78288. This defendant may be served through its designated agent for service of process, CT Corporation System of Mississippi, 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

      44.    Defendant Safeco Insurance Company of Illinois is an insurance company registered with the Mississippi Department of Insurance to do business and is doing business within the state of Mississippi whose corporate headquarters is located at 27201 Bella Vista Parkway, Suite 130, Warrenville, Illinois 60555. This defendant may be served through its designated agent for service of process, United States Corporation Company, 506 South President Street, Jackson, Mississippi 39201.

      45.    Defendant Shelter Mutual Insurance Company is a mutual insurance company registered with the Mississippi Department of Insurance to do business and is doing business within the state of Mississippi whose corporate headquarters is located at 1817 W. Broadway Columbia, Missouri 65218.  This defendant may be served through its designated agent for service of process, CT Corporation System of Mississippi, 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

      46.    Defendant Direct General Insurance Company is an insurance company registered with the Mississippi Department of Insurance to do business and is doing business within the state of Mississippi whose corporate headquarters is located at 10 W. Market Street, Suite 1050,

Indianapolis, IN 46204. This Defendant may be served through its designated agent for service of process, Sharon Patterson Thibodeaux, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

47.     Defendant Shelter General Insurance Company is an insurance company registered with the Mississippi Department of Insurance to do business and is doing business within the state of Mississippi whose corporate headquarters is located at 1817 West Broadway, Columbia, Missouri 65218. Upon information and belief, this Defendant's designated agent for service of process, Mr. Charles A. Brewer, is now deceased and a new agent has not yet been appointed. This Defendant may be served with process through the Mississippi Commissioner of Insurance as set forth by Mississippi Code Section 83-21-1.

48.     Defendant Mississippi Farm Bureau Casualty Insurance Company is an insurance company registered with the Mississippi Department of Insurance to do business and is doing business within the State of Mississippi whose corporate headquarters is 6310 I-55 North, Jackson, MS 39211. This Defendant may be served through its designated agent for service of process, Mr. Jim Rowles, 6311 Ridgewood Road, Jackson, MS 39211.

## JURISDICTION AND VENUE

49.     Original jurisdiction and venues exists in this Court pursuant to 28 U.S.C. § 1331, as the Plaintiffs assert causes of action arising under the United States Constitution, and/or laws and treaties of the United States; and 28 U.S.C. § 1391(b)(2), as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim(s) occurred.

## **FACTS**

50.     Each individual Plaintiff is in the business of recovery and/or repair of motor vehicles involved in collisions.

51.     Defendants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively "State Farm" or "State Farm Defendants") are insurers providing private passenger automobile insurance to consumers throughout the State of Mississippi, and payment of third-party claims to consumers throughout the State of Mississippi.

52.     Defendants Progressive Gulf Insurance Company and Progressive Casualty Insurance Company (collectively "Progressive" or "Progressive Defendants") are insurers providing private passenger automobile insurance to consumers throughout the State of Mississippi, and payment of third-party claims to consumers throughout the State of Mississippi.

53.     Defendants Allstate Property and Casualty Company and Allstate Insurance Company (collectively "Allstate" or "Allstate Defendants") are insurers providing private passenger automobile insurance to consumers throughout the State of Mississippi, and payment of third-party claims to consumers throughout the State of Mississippi.

54.     Defendants Nationwide Mutual Insurance Company and Nationwide Property and Casualty Insurance Company (collectively "Nationwide" or "Nationwide Defendants") are insurers providing private passenger automobile insurance to consumers throughout the State of Mississippi, and payment of third-party claims to consumers throughout the State of Mississippi.

55.     Defendants GEICO General Insurance Company and GEICO Indemnity Company (collectively "GEICO" or "GEICO Defendants") are insurers providing private passenger automobile insurance to consumers throughout the State of Mississippi, and payment of third-party claims to

consumers throughout the State of Mississippi.

56.     Defendant United Services Automobile Association ("United Services" or "United Services Defendant") is an insurance association providing private passenger automobile insurance to consumers throughout the State of Mississippi, and payment of third-party claims to consumers throughout the State of Mississippi.

57.     Defendants USAA Casualty Insurance Company and USAA General Indemnity Company (collectively "USAA" or "USAA Defendants") is an insurance company providing private passenger automobile insurance to consumers throughout the State of Mississippi, and payment of third-party claims to consumers throughout the State of Mississippi.

58.     Defendant Safeco Insurance Company of Illinois ("Safeco" or "Safeco Defendant") is an insurance company providing private passenger automobile insurance to consumers throughout the State of Mississippi, and payment of third-party claims to consumers throughout the State of Mississippi.

59.     Defendants Shelter Mutual Insurance Company and Shelter General Insurance Company (collectively "Shelter" or "Shelter Defendants") are insurance companies providing private passenger automobile insurance to consumers throughout the State of Mississippi, and payment of third-party claims to consumers throughout the State of Mississippi.

60.     Defendant Direct General Insurance Company of Mississippi ("Direct General" or "Direct General Defendant") is an insurance company providing private passenger automobile insurance to consumers throughout the State of Mississippi, and payment of third-party claims to consumers throughout the State of Mississippi.

61.     Defendant Mississippi Farm Bureau Casualty Insurance Company ("Farm Bureau"

or "Farm Bureau Defendant") is an insurance company providing private passenger automobile insurance to consumers throughout the State of Mississippi, and payment of third-party claims to consumers throughout the State of Mississippi.

62.     Each individual Plaintiff is in the business of recovery and/or repair of motor vehicles involved in collisions.

63.     Plaintiffs perform repairs on vehicles garaged at locations throughout the State of Mississippi.   In addition, Plaintiffs in north Mississippi, particularly Plaintiff Bill Fowler's Bodyworks, Inc., regularly perform repairs on vehicles garaged within the State of Tennessee, and Plaintiff body shops located near the Interstate 10 corridor through south Mississippi, regularly perform repairs on vehicles from various locations throughout the United States.

64.     Each individual Defendant is an insurer providing automobile policies to consumers throughout the state of Mississippi.

65.     The Plaintiff body shops have done business at various times over the course of years with the Defendants' policyholders and claimants by providing to these policyholders and claimants motor vehicle collision repair services.

66.     Each Defendant is individually responsible for payment for those repairs for their respective policyholders and claimants.

67.     Over the course of several years (as further described below), the Defendants have engaged in an ongoing, concerted and combined intentional course of action and conduct to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants.

68.     Over the course of several years (as described below), the Defendants have engaged

in an ongoing, concerted and combined intentional course of action and conduct to boycott and tortiously interfere with Plaintiffs' respective business for purposes of coercion, economic duress, retaliation, and to otherwise harm Plaintiffs as well as substantially increasing their own profits by steering customers away from Plaintiffs' business to body shops which comply with the Defendants' fixed prices.

69.     Defendants have intentionally combined to utilize their aggregated market power to exert control over every aspect of the collision repair industry, including but not limited to price fixing of labor rates, price fixing of replacement parts, compulsory use of substandard or dangerous replacement parts, compulsory use of a parts procurement program which directly financially benefits State Farm Defendants and indirectly benefits the remaining Defendants, boycotting shops which refuse to comply with either fixed prices or use of substandard or improper parts, and interfering with Plaintiffs' current and prospective business relations by intentionally misrepresenting and making knowingly false statements regarding the quality, efficiency and ethical reputation of Plaintiffs' businesses, exerted economic duress and coercion upon both the Plaintiffs to capitulate and upon consumers, including direct threats to consumers to refuse coverage or portions of available coverage if consumers persist in their efforts to patronize Plaintiffs' businesses.

70.     Defendants' actions have caused a complete eradication of competition within the body shop industry.

71.     Defendants' actions violate federal and state law.

72.     Defendants' actions have caused damage to the Plaintiffs.

Defendants' Market Share within the Market Area of the State of Mississippi

73.     According to the Mississippi Department of Insurance market share report for

calendar year December 31, 2013, the named Defendants hold over **seventy five percent (75%)** of the private passenger auto physical damage insurance market in the market area of the State of Mississippi. See Mississippi Insurance Department Company Market Share Report, Private Passenger Auto Physical Damage, 2013 , attached hereto as Exhibit "1."

74. Market shares of reported respective Defendants are:

- State Farm Defendants                26.33%

- Mississippi Farm Bureau              13.10%

- Allstate Defendants                  10.42%

- Progressive Defendants                6.42%

- GEICO Defendants                      4.64%

- Nationwide Defendants                 4.29%

- USAA Defendants                       4.23%

- Safeco                                2.5%

- Shelter Defendants                    2.4%

- Direct General                        1.53%

75. While each individual Defendant below the top three market share holders may seem insignificant, the market share percentages do not convey the importance of the Mississippi market to the insurer. For instance, USAA's market share of 4.23% actually translates into earned premiums of nearly $20,000,000.00 and Direct General's 1.53% equals reported earned premiums of over $5,300,000.00. See Exhibit "1."[1]

_____

[1]According to the 2010 United States Census, the entire state of Mississippi has a population of less than three million people.

76.     Collectively, the Defendants earned premiums from sales in Mississippi of over $240,000,000.00 . By way of comparison, the entire budget for the State of Mississippi for fiscal year 2014 was slightly over $330 million.

77.     Overall, courts have acknowledged the significant role played by insurance companies in funding automobile collision repairs, as well as the ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repairs. See, e.g., *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006)(aff'd, *Allstate Ins. Co. v. Abbott*, 2007 U.S. App. LEXIS 18336 (5th Cir. 2007).

78.     State Farm holds the substantial majority market share in the Mississippi market. However, what is more important for purposes of this Complaint is the overwhelming majority of the market the Defendants collectively represent and, thus, the nearly complete collective control over claims for auto body collision repairs, whether as first-party insurer or third-party liability carrier within the market area of the State of Mississippi.

79.     State Farm plays the leading role in establishing the fixed prices and boycotting, as well as other violations of law, though it does not act alone to effect application of violations of law.

Body Shop Cost and Revenue Structure

80.     Body shops have several sources of cost and revenue: labor, parts, paint and materials, mechanical, electrical and administration. Each of these categories often include subcategories with variable costs.

A.     Labor

81.     Collision repair involves several stages, each of which involves different activities and processes: body labor, painting and refinishing. Ordinarily, each of these labor stages have

-15-

individual labor rates. For instance, posted labor rates for Plaintiff Smith Brothers include body labor at $65.00 per hour, refinishing at $65.00 per hour and paint and materials at $48.00 per hour.

A.1.    Body Labor

82.     Body labor is the repair process wherein damage to the body of the vehicle is repaired, either by replacing a damaged part or mending it.

83.     Within body labor, there are different rates which vary with the material of which a vehicle is constructed. Fiberglass composites and aluminum are more difficult to repair than steel, require additional, specialized equipment and different skill sets of its technicians. Therefore repairs on vehicles made of fiberglass composites (such as Corvettes) or aluminum body panels (such as Buick LeSabre, BMW Z8 and 7 Series and Nissan Altima) have higher hourly labor rates.

84.     Another aspect of labor is frame/unibody repair. In order to repair the frame/unibody of a vehicle, the vehicle must be stabilized on a dedicated frame machine so as not to further damage the frame/unibody, measured (usually by a laser measuring tool or other computerized optic or manual measuring tool) to determine both where the frame/unibody is damaged and how much damage has been sustained. The frame is then slowly pulled via hydraulic towers to reverse the incurred damage. This process must be done at a deliberate pace as a rushed frame pull may cause further damage or destroy the frame altogether.

A.2..   Refinish

85.     Refinishing includes the processes necessary to complete repairs and smooth the repaired or replaced body surfaces once the body repair has been completed in preparation for painting. Common refinishing processes include application of primer, sealer (a barrier coat between the bare material and paint necessary to prevent negative reaction with the paint), base coat,

-16-

and, depending upon the finish of the vehicle, an additional mid-coat. Refinishing also includes the mixing of the liquid component colors to match and blend with the undamaged paint on the vehicle.

86.     Refinish labor rates are usually equal to or slightly less than body labor rates (see above).

A.3.    Paint and Materials

87.     Painting a vehicle is, in many ways, a process which does not require explanation. However, application of paint to a vehicle is not a one-step process. Paint is usually applied in a paint booth, a self-contained controlled environment, separate from the repair areas of a shop. The booth must have a clean air intake filtering system to filter and reduce contaminants entering the booth, and an outgoing filtering system to reduce the contaminants released into the atmosphere.[2]

88.     Prior to painting, the vehicle must be washed. the undamaged portions of the vehicle must be covered (or "masked") and taped off to avoid over-spray, including tires and wheel wells. Once the paint has been completed, a clear coat is applied and the vehicle left to dry.

89.     The process from repair to refinish to paint is usually not linear. Most repairs require several refinishing processes and paint processes at various points in the repair. For example, replacing a bumper. The bumper must be sanded, primed and the inside of the bumper painted to match the vehicle before it is bolted onto the vehicle and the vehicle is returned to the refinish and paint processes to complete the repair. Depending on the nature of the repair made and its location on a vehicle, a repair may require several refinish and paint procedures interspersed with repair procedures before completion.

---

[2]The Environmental Protection Agency has regulations for hazardous material emissions with which shops are required to comply. Shops must also comply with hazardous material disposal requirements.

90.     Additionally, it is not only the damaged portion of a car which must be addressed. In order to avoid clashing paint at the point where the repaired portion meets the undamaged portion, the undamaged portion must be sanded  and the paint blended into the existing color to create a seamless transition between original paint and new paint.

91.     Because it is not possible, even in the controlled environment of a paint booth, to completely remove all dust and contaminants from a vehicle that has been on the open roads (particularly the undercarriage), the air pressure of the paint process causes some amount of dust and small contaminants to become airborne and settle in the paint.  When the paint dries, these contaminants cause an uneven surface in the paint.  An additional refinish process must be completed to smooth out the imperfections.  While there is some regional variation in the name, this process is generally recognized as de-nibbing and finessing.  Without this process, the finished product would not return the vehicle to its pre-loss condition and would always have an uneven finish and appearance.

92.     Traditionally, paint labor rates have included material costs, calculated as a percentage of refinish hours for a given repair, and expressed as an hourly rate based upon a standard repair.  However, in many instances, this method does not compensate the shop for the actual costs of labor and materials and result in the shop working at a loss.  For instance, pearlized finishes on vehicles require multiple steps, different paints and finishes to be applied in several coats and the job takes far longer and requires more labor than a one-step coat of white paint.

93.     Other times, vehicles have unique colors that require both special-order paints and mixing to achieve the desired result to blend with the undamaged portion of the vehicle.  Ferrari red, for example, is a unique color with high color saturation and brightness.

94.     Because of this variability, which has become more frequent in recent years, the traditional method has not kept pace with the actual costs of completing repairs. Many shops, though not all, have begun using a paint and material calculator, or PMC. A PMC is a computer program which calculates the cost of the paint and materials actually used in a particular repair. Actual costs are pre-programmed to account for the costs of specific materials (i.e., Sikkens brand of paint versus Axalta brand of paint). A shop can load the type of repair completed and the program calculates the amount and cost of the materials used, produce an invoice and this becomes part of the final bill along with the paint labor costs.

B.     Parts

95.     Parts constitute a significant expense for shops. There are three types of parts generally recognized in the body shop industry: Original equipment manufacturer parts ("OEM" parts) are new parts manufactured by the same manufacturer as the vehicle. OEM parts are specifically designed for specific cars.

96.     Aftermarket parts are new parts manufactured by a company other than the original equipment manufacturer. These are frequently referred to as imitation or counterfeit parts.

97.     Salvage parts are parts stripped from previously wrecked vehicles. Salvage parts are often referred to as "recycled parts" by insurance companies.

98.     Body shops do not keep a supply of all parts on hand. Parts are ordered as needed. With occasional exceptions, Defendant insurers write estimates requiring use of aftermarket or salvage parts. Aftermarket and salvage parts are, ostensibly, less expensive than OEM parts and, at least according to Defendant insurers, of equal quality to OEM parts. This is simply not true, as discussed below but it does not discourage Defendant insurers from compelling their use.

99.    Some insurers, such as State Farm, require use of an online parts procurement program called PartsTrader by its preferred shops.  PartsTrader is a subscription online vendor market place.  In theory, a subscribing shop can go onto the PartsTrader web site, input the part required and will receive bids from vendors who have the part available for sale and from these bids, the shop may select the proper part at a competitive price or, if a quality part is not available, may purchase the part elsewhere.

100.    In reality, State Farm requires compulsory use of PartsTrader.  A shop is not permitted to select the proper part or shop elsewhere if a quality part is not available through PartsTrader.  State Farm requires the purchase of the cheapest part available, even if it is not of like kind or quality, originates from a source of questionable or unknown provenance or even is known to be manufactured of poor quality.

101.    If a shop refuses to purchase such parts, but opts for a higher quality, safer part, the Defendant insurers, particularly but not exclusively State Farm, will pay only the amount for which the part could have been purchased, regardless of its quality or lack thereof.

102.    With respect to State Farm in particular, this practice benefits it in two direct fashions.  First, it immediately reduces the amount it must pay out in repair costs.  Second, State Farm is a primary investor in PartsTrader.  It underwrote the cost of developing the program and has a contract with the ostensibly independent company for repayment of this investment as well as a portion of the profits going forward.

103.    With respect to the other Defendants, they benefit also by insisting on use of aftermarket or salvage parts as a means of reducing claims payments.  In many instances, a Defendant insurer will order the parts independently and ship them to the body shop or directly

specify a part and vendor from which a purchase must be made, again, regardless of quality, kind or fit.

104.     Professional repairers on the whole prefer and recommend use of OEM parts for both safety and quality reasons.  Aftermarket parts, while new, are often inferior.  There are no federal safety requirements for aftermarket crash parts.  Aftermarket parts are often made of thinner materials, or multiple pieces spot-welded together instead of a single piece, which directly affects a vehicle's safety performance in a crash.  Because they are not subject to federal safety testing, aftermarket parts are not guaranteed to perform as OEM parts.

105.     For instance, in a front-end crash, the bumper plays a critical role in deployment of a vehicle's air bags.  The bumper is the first structure to absorb impact which creates a series of vibrations which then alert air bag sensors to the possible need to deploy and how fast they need to deploy.  Often being made of different, thinner, cheaper materials, aftermarket bumpers do not vibrate in the same manner as OEM bumpers, if they vibrate at all, and can result in failure of the air bag system.

106.     Vehicle hoods are also designed to crumple in a particular manner so as to absorb and distribute impact energy to protect people within the passenger compartment.  Aftermarket hoods, again made of thinner, cheaper material, do not crumple in the same manner OEM parts are designed and tested to perform, thereby endangering people within the vehicle.

107.     Even aftermarket windshield glass poses a safety risk to vehicle occupants.  In a rollover crash, the windshield works to keep the vehicle roof from collapsing.  Aftermarket glass is thinner than OEM glass, and is not designed to fit a particular vehicle.   As with other aftermarket parts, replacement glass is not subject to crash testing requirements, thinner glass may shatter rather

than providing protection in a rollover or may simply pop out altogether.

108.    The majority of the time, aftermarket parts simply do not fit properly.  A study conducted by the California Department of Consumer Affairs, Bureau of Automotive Repair found that four of five non-OEM crash parts tested were inferior to OEM parts.  Non-OEM parts had to be modified to fit a vehicle they were supposed to fit without modification, resulting in additional labor time, the cost of which, in addition to the cost of the part itself, actually make the non-OEM part more expensive than the OEM part.

109.    However, in the vast majority of instances, Defendant insurers refuse to pay the additional labor time to modify non-OEM parts they themselves insist on using, calling it "the cost of doing business."

C.    Mechanical

110.    Often, collision repair involves not only damage to the body of the vehicle but also to mechanical parts such as the engine.  In order to complete the repair, mechanical repairs are necessary.

111.    Some shops have mechanical repair specialists on premises.  When they do, a separate hourly rate applies to work performed by mechanics.  For instance, Plaintiff Capitol Body Shop performs mechanical work at the rate of $ 96.00 per hour.

112.    Shops which do not perform mechanical work in house sublet the job to an outside source.  The cost of repair includes the actual cost of the mechanical repairs plus a "mark up" ranging between twenty five and thirty five percent (25-35%) of the mechanical bill to cover the cost of transporting the vehicle to and from the sublet location.  The mark up covers not merely the actual costs of transportation, such as gasoline or a tow truck when needed, but also the cost of the

employee who must transport the vehicle and be diverted from in-house duties.

D.     Administrative Costs

113.     Administrative costs are those fees assessed for necessary non-repair work. Almost exclusively, non-repair administrative work are tasks compelled by the Defendant insurers. Insurers often require numerous photographs be taken and transmitted electronically before approval for work will be given.

114.     Alternatively, many of the Defendant insurers will refuse to pay for processes or procedures performed or parts utilized unless a photograph is provided.

115.     Defendant Direct General will demand pictures of each stage of repairs. This is not required of all repairs but is demanded erratically and without schedule and Direct General will threaten to refuse all payment in the absence of photographs.

116.     Defendant State Farm demands photographs of denib and finesse procedures for every repair or will refuse to pay for the procedure.

117.     Defendant Allstate frequently demands photographs of repairs at various stages or will refuse to pay for repairs.

118.     Parts must be received and inspected. As most aftermarket and salvage parts required by the Defendant insurers are inappropriate, broken or of poor quality, they must be repackaged and returned to the seller, and new parts ordered, utilizing employee time, resources and expenditure of funds which would not be required but for the Defendant insurers stipulations.

119.     Administrative fees vary from shop to shop. Some bill by flat fee, others by task. But again, almost universally, the Defendant insurers refuse to pay these charges though the tasks are compelled by the insurers under threat of refusing to pay for repairs.

ROLE OF DIRECT REPAIR PROGRAMS

_____120.    At their initiation, direct repair programs ("DRPs") were apparently intended to benefit consumers by ensuring a pre-screened pool of reputable, quality body shops existed to which customers and claimants could be referred.  Allstate is generally believed to have been at the forefront of the DRP initiative in the 1970s.

121.    In addition to Defendant Allstate, the vast majority of major insurers created DRPs over the years, including Defendants State Farm, Progressive, GEICO,[3] Safeco, Nationwide, USAA, Direct General and Shelter.[4]

122.    Over the course of intervening years, the emphasis of DRPs completely shifted course and direction. Defendant insurers tout their programs publicly as beneficial, time-saving and cost-saving for consumers.  One-stop shopping for collision repairs–going to a DRP, a consumer can take of their claim needs, rental car needs and collision repair needs in one neat package.

123.    This continues to be the public face of direct repair programs.  The reality, however, is starkly contrary.  Instead of ensuring quality repairs, DRPs became vehicles for suppressing repair costs to the detriment of the Plaintiffs and consumers.  Insurers steer or coerce consumers to their DRP shops, again proclaiming their benefits, while knowing many DRP shops across the nation consistently and willfully fail to make safe and proper repairs.

124.    Not all DRPs are poor repair facilities, not even most.  Most are honorable, hardworking and professional collision repairers.  Many Plaintiffs have associated with DRPs from

---

[3]In pleadings filed publicly in another case, GEICO denied it has or ever had a DRP. However, this is not true.  GEICO offers its ARX Program

[4]Shelter announced in the fall of 2014 it was disbanding its DRP.

time to time over the last twenty years, though the majority have since left all such programs.

125.    DRPs are not in and of themselves a problem.  It is the use to which the Defendant insurers have put them, primarily over the last ten to fifteen years, which have created a national atmosphere where one industry–insurers–control and direct the entire business of a wholly separate industry– auto body collision repair shops.

126.    DRPs were originally presented to body shops as a mutually beneficial opportunity. In exchange for providing guarantees of pricing under a "most favored nation" ("MFN") clause, as well as preferential timing of repairs, the individual Defendants would list the body shop as a preferred provider.  However, no such beneficial exchange actually appears anywhere within DRP agreements, making even this illusory.

127.    However, over the course of years, the concessions demanded by the individual Defendants with DRPs increased incrementally until, in the present day, insurers exert complete control over every aspect of a body shop's business.

128.    At present, Defendant insurers with direct repair programs require a shop to not only accept fixed prices on labor, fixed prices on paint and materials, fixed pricing procedures on parts, refusal to compensate or fully compensate for processes and procedures, but many compel the shop to include the DRP sponsor as an additional insured on the shop's liability insurance (even though the sponsor holds no lien or other ownership interest), compel indemnification for liability assessed to the sponsor, compel primary assumption of liability for repairs using parts provided by or insisted upon by the sponsor, compel mandatory production of the shop's financial information and books upon demand, and authority to obtain background checks upon the shop's employees at the sponsor's will and pleasure.

129.    Some terms of DRP agreements are consistently disregarded by the sponsoring insurer when it is in their immediate financial interest.  For example, State Farm's Select Service DRP requires use of certified parts for crash-related parts such as bumper assembly and radiator supports. However, State Farm regularly and routinely writes estimates including and will only pay for salvaged crash-related parts of unknown provenance and without any indicia of soundness or crash worthiness.

130.    As noted above, DRP agreements also require the shop to both maintain the sponsoring insurer (in this example, State Farm) as a named insured on the shop's liability insurance, and  require indemnification for any liability as a result of parts failure even when, as State Farm does, the sponsoring insurer regularly and routinely breaches its own requirements.

131.    Failure to comply with DRP terms results in a pattern of coercion and implied threats to the pecuniary health of the individual Plaintiff businesses.  Failure to comply with any express term or failure to comply with a self-selected avoidance of a term by the sponsoring insurer (such as described immediately above) results in  either removal from the program(s) combined with improper "steering" of customers away from the Plaintiffs' businesses, or simply punishment to decrease the number of customers utilizing the Plaintiffs services, and/or increasing ongoing and improper refusals to pay for certain repair procedures and/or charges without valid or reasonable justification.

132.    DRP agreements are not enforceable contracts.  They do not contain essential legal elements of an enforceable contract, most notably consideration as DRPs promise no performance of anything by the sponsoring insurer and offer nothing of value to a body shop.  All purported benefits and concessions flow from a body shop to the sponsoring insurer which undertakes no

obligations of any kind in return.

133.    Nor do Defendants with DRPs treat them as enforceable contracts.  No insurer has ever sought legal redress for alleged breaches of a DRP, sponsoring insurers regularly disregard terms as they see fit when it benefits them (i.e., requiring shops to only use certified and/or tested crash-related replacement parts) and interpreting "most favored nation" clauses to mean labor rates and other compensation may be set by the insurance industry through combination or conspiracy rather than the ordinary definition given that term, which is the shop will provide to the DRP sponsor the best rates made available to other customers.  The insurer's interpretation results in the tail wagging the dog.

134.    Plaintiffs do not allege any contract exists between themselves and any Defendant, individually or as a group.  If any Defendant wishes to assert the existence of a valid contract between itself and any or all Plaintiffs, they are free to do so.  However, applicable authority requires any Defendant who wishes to do so plead the existence of an express contract in their respective Answer(s) and any Defendant who so asserts bears the legal burden of proof of same, including the legal enforceability of such under the laws of the State of Mississippi.

<u>Non-DRP Shops and Defendant Insurers Without DRPs</u>

135.    Whether or not an insurer sponsors a formal direct repair program is irrelevant. Equally irrelevant is whether or not a body shop has associated with any DRPs.  The Defendant insurers collectively and through exertion of their combined market share power, enforce against non-DRP Plaintiffs, non-compliant DRP Plaintiffs and other body shops as many DRP "concessions" as they possibly can, either explicitly or by de facto substitute.

136.    Borrowing the concept of a "most favored nation" clause while turning it on its head,

-27-

the Defendant insurers compel acceptance of a fixed pricing structure by asserting they, as a group and with the power of a group, have the ability to set the rates the Plaintiffs are permitted to charge for their services. The details of the pricing structure are set out below.

137. No law or other authority has ever been identified which permits the Defendant insurers to set the pricing structure of the collision repair industry, nor compel them to purchase certain parts or materials, nor determine the work which constitutes a full and safe repair. Yet that is precisely what the Defendant insurers have done, simply by imposing their collective will upon the body shop industry, and coercively and improperly exploiting every possible financial vulnerability.

138. Insurers assert they are merely paying the "market rate" or "prevailing rate." However, this is a misrepresentation. "Market rate" and "prevailing rate" are terms used to describe a median or average of rates in a particular industry as they ebb and flow over both time and geography, react to market influences, innovations and advances in the field, and competition between practitioners of that trade or profession.

139. In other words, in any other industry, an MFN or "market rate" discussion would assume the existence of a free market. Gas stations compete with each other, introducing new products they hope will appeal to the public, raising and lowering their prices, sometimes with astonishing speed, based upon the competitions' published prices, market availability of an increasingly scarce resource, government regulation and world events. A trucking company entering into an MFN agreement with a gas station would require the best price that gas station makes available to any other customer.

140. It would be wholly inconsistent with accepted principles of a free market, the law and

contract term interpretation if that company decided that instead of demanding the best price available from the gas station, it banded together with nearly every other trucking company to exploit the gas stations' need for gasoline to be delivered by the trucking companies and arbitrarily decided what gas should cost for themselves. And not just at a single gas station but at every gas station in America.

141.    That is precisely what has occurred, aided by the formatting of DRPs and the enormous power the Defendants collectively hold.

142.    Defendants cannot legally compel non-DRP body shops to agree to parts discounts the insurers have independently contracted with parts suppliers.

143.    The Defendants can, however, and do compel non-DRP shops to accept the de facto equivalent–Defendant insurers, as a concerted and agreed upon action, simply refuse to pay more for parts that the cheapest a part can be purchased. This is so whether or not the part is safe, appropriate, of like kind or quality, actually used or even available. More than one insurer has limited parts compensation to what a part could be purchased for in some other location, even if it isn't available where the part is needed.

144.    Defendants cannot legally compel non-DRP body shops to assume indemnification of them for liability arising out of repair procedures dictated by the Defendants, or parts purchases dictated by the Defendants, or product defects from the materials the Defendants dictate must be used.

145.    They can, however, and do ensure that all documentation they prepare and produce clearly and unambiguously advises the consumer no liability for any of those things is accepted by the Defendants for any unfortunate results of their dictates.

146.    And certainly no legal authority permits the Defendants to arbitrarily and through artificial, manipulated means, impose labor rates determined wholly within the insurance industry upon the collision repair industry. Nor does any legal authority permit the Defendants to maintain this status quo through combining their collective power, acting with uniform intent in concert in exercise of that collective power and exacting group retribution against those who do not comply.

147.    Yet that is precisely what they are doing.

148.    In reality, the Plaintiffs have no option but to do business with consumers for whom the named Defendants are responsible for paying for repairs. As noted, the named Defendants control over seventy five percent (75%) of the private passenger insurance market within the State of Mississippi. Refusing to do business with the named Defendants' insureds and claimants excludes three-quarters of the population of potential customers within the state, a situation not feasible for a shop that wishes to stay in business. There is no meaningful option.

149.    Nor is there any meaningful opportunity to negotiate. Payment is presented to Plaintiffs on a "take it or leave it" basis. Attempts to obtain better terms results in not only refusal, but threats of pecuniary harm, retaliation, boycotting, and coercion.

150.    Whether or not a Plaintiff is associated with any of the named Defendants' DRPs does not alter this.

151.    No Plaintiff is associated with the DRPs of Defendants GEICO, Direct General, Safeco, Mississippi Farm Bureau, State Farm, or Shelter.

152.    Plaintiff Pitalo's is associated with Allstate's DRP but did not agree to allow Allstate to fix its rates or assume control of the repair process of vehicles entrusted to it by consumers.

153.    Plaintiff Alexander Body Shop is associated with Allstate's DRP but did not agree

to allow Allstate to fix its rates or assume control of the repair process of vehicles entrusted to it by consumers.

154.    Plaintiff Crystal Car Care is associated with Progressive's DRP but did not agree to allow Progressive to fix its rates or assume control of the repair process of vehicles entrusted to it by consumers.

155.    Plaintiff Patriot Auto Body is associated with Nationwide's DRP but did not agree to allow Nationwide to fix its rates or assume control of the repair process of vehicles entrusted to it by consumers.

156.    Plaintiff George Carr Buick is associated with the DRPs of USAA and Shelter but did not agree to allow Nationwide to fix its rates or assume control of the repair process of vehicles intrusted to it by consumers.

157.    Defendants actions are in violation of state and federal law.

<u>**CONTROL OF THE REPAIR PROCESS**</u>

158.    Insurance companies are not body shops.  They sell insurance.  Body shops are not insurance companies.  They repair damaged vehicles.  The body shop industry does not compete with the insurance industry, nor vice versa.

159.    Nevertheless, the Defendant insurers have officiously interjected themselves into every step and aspect of automobile collision repairs.   Although Plaintiffs' agreement to effect repairs is with the individual consumers, all Defendants require all Plaintiffs to wait to begin repairs until after an agent of the responsible insurer has inspected the damaged vehicle upon threat of refusal to pay for necessary repairs.  All estimates prepared by the agent of all Defendants include the statement that the estimate is not an authorization to repair (although that is a right belonging to

the consumer, not the Defendants).

160.    When hidden damage not apparent at the first inspection is discovered, all Defendants require all Plaintiffs to either wait for an agent to return to inspect the vehicle or take pictures of the additional damage and gain approval from the responsible insurer Defendant before fixing said damage, upon threat of refusal to pay for necessary repairs, even when the vehicle owner has already authorized repairs.

161.    Although the choice of type of repair parts (OEM, aftermarket or salvage) belongs to the consumer, all Defendants require or attempt to require Plaintiffs to accede to Defendants' written estimates specifying salvaged or aftermarket parts, even when such contradict the express direction of the vehicle owner.

162.    All Defendants compel or attempt to compel use of particular vendors for parts procurement.  Failure to comply with this requirement, even when compliance is not actually possible, i.e, the specified vendor does not have a particular part available, results in refusal to pay for the part actually used for the repair in full.

163.    All Defendants limit or attempt to limit the processes and procedures used in a given repair, even when the collision repair professional asserts a professional opinion which conflicts with the insurer representative, who is not a collision repair professional.

## PRICE FIXING

### A.    Labor Rates

163.    All Defendants assert they will pay no more than the market rate for labor in the market area.  Why the Defendant insurers believe they are legally entitled to determine the rates an entirely separate industry is permitted to charge has never been publicly disclosed.

164.     However, even setting that aside, only one company, State Farm, conducts any sort of inquiry into body shop rates, what it terms its "surveys" to purportedly determine a labor market rate in a market area.  This survey is described below.

165.     The Allstate Defendants do not conduct a market rate survey.

166.     The Nationwide Defendants do not conduct a market rate survey.

167.     The GEICO Defendants do not conduct a market rate survey.

168.     The Progressive Defendants do not conduct a market rate survey.

169.     The USAA Defendants do not conduct a market rate survey.

170.     The Shelter Defendants do not conduct a market rate survey.

171.     United Services Defendant does not conduct a market rate survey.

172.     Safeco Defendant does not conduct a market rate survey.

173.     Farm Bureau Defendant does not conduct a market rate survey.

174.     State Farm does not publish or make publicly available the labor rates it has created as the "market rate."

175.     In other litigation, State Farm has maintained claim handling/payment information is proprietary and  specifically requested entry of protective orders to safeguard this purportedly private information from public disclosure.  See, e.g., *Ward v. State Farm Mut. Auto. Ins. Co.*, 2012 U.S. Dist. LEXIS 105485 (D. Nev. July 30, 2012), *Akins v. State Farm Mut. Auto. Ins. Co.*, 2011 U.S. Dist. LEXIS 82806 (E.D. Mich. 2011) *Chauvin v. State Farm Mut. Auto. Ins. Co.*, 2011 U.S. Dist. LEXIS 50522 (E.D. Mich. 2011), *Pochat v. State Farm Mut. Auto. Ins. Co.*, 2008 U.S. Dist.

LEXIS 100389 (D.S.D. 2008). [3]

176.    Allstate, Nationwide, Progressive, GEICO, USAA, United Services, Shelter, and Safeco intentionally and by agreement specifically advised the Plaintiffs they will pay no more than State Farm pays for labor.  Examples include, but are not limited to, the following:

177.    Allan Wade of USAA has specifically told Plaintiffs USAA will pay no more than State Farm pays and only authorizes/authorized payment in that amount.

178.    Robbie Long of Progressive has specifically told Plaintiffs Progressive will pay no more than State Farm pays and only authorizes/authorized payment in that amount.

179.    Robbie Minyard of GEICO has specifically told Plaintiffs GEICO will pay no more than State Farm pays and only authorizes/authorized payment in that amount.

180.    Sean Lalley of USAA has specifically told Plaintiffs that "When State Farm pays it, we pay it."

181.    Larry Henderson of Allstate, Gwen Washington of Nationwide and agents/employees of Safeco whose names are presently unknown have all told Plaintiffs the labor rates their respective companies pay is directly contingent upon State Farm's rates.

182.    These statements are consistent across the country.  For instance, in Oklahoma, Chad Turner of USAA told Blevins Paint and Body that labor rates would be going up shortly because the new State Farm survey results had just been sent out and it would take USAA a couple of weeks to put them in motion.

_____

[3]State Farm habitually obtains blanket protective orders and/or orders to seal case information and discovery, even when the information requested does not qualify as protectable.  See, e.g., *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1136-38.

-34-

183.    In Alabama, GEICO adjuster Tarria Poplar told Oak Mountain Body Shop that State Farm is "the Big Brother," and "When State Farm starts paying the rate then GEICO will."

184.    Forrest Odom of Allstate Insurance told Oak Mountain when State Farm changes their labor rate, Allstate would change their rate because, "State Farm is the big dog in the hunt."

185.    In Louisiana, Tim Boudreaux of Louisiana Farm Bureau has told Advanced Collision his company will only pay what State Farm pays.

186.    As State Farm habitually seals this information in other litigation and does not publicize or otherwise make publicly available the information regarding payment of repair claims, the only reasonable inference and only rational conclusion which may be reached is State Farm provided this information to the other individual Defendants, as admitted by Chad Turner of USAA.

187.    State Farm conducts its purported survey by asking shops to fill in their individual rates for body labor, refinish labor, paint, and so forth, via an online site, State Farm's Business2Business portal, or B2B.

188.    However, State Farm does not merely collect the information provided and perform statistical or arithmetic calculations.  Upon receipt of rates it unilaterally deems too high, State Farm will either contact the shop and order it to amend the survey response to a lower number it finds acceptable or it will unilaterally alter a shop's information without the knowledge or consent of the shop involved.

189.    Most often, though not exclusively, State Farm's orders to reduce or unilateral reduction of rates occurs with larger shops or independent shops which operate more than one location.  The reason for this is described below.

190.    When State Farm selects the first option as an initial action, the order to reduce the

rates entered on the B2B portal are accompanied by threats of removal from the DRP and promises to steer business away from the non-compliant shop if a shop does not comply immediately.

191.    Once the information has been altered to State Farm's satisfaction (whether by a shop under duress or unilaterally without the shop's knowledge), it them performs its "half plus one" form of math. State Farm lists the shops in a given market (as determined by State Farm) with the highest rates submitted at the top of the list and  the least expensive hourly rates at the bottom.

192.    State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser.  State Farm then totals the number of technicians or work bays and employs its "half plus one" math.  As an example, if the total number of technicians/work bays for a given area as determined by State Farm equals fifty, State Farm's magic number would be twenty-six (half fifty plus one).

193.    Beginning at the bottom of the list with the cheapest shops, State Farm then counts the number of technicians/work bays up the list until it reaches its magic number.  The rates of whichever shop this happens to fall upon is declared the "market" or "going rate."

194.    The problems with this methodology are numerous.  The rates themselves are artificially created by State Farm at the very beginning of the process.  The math does not represent any identifiable form of professionally accepted methodology, even if the numbers used in that process reflected the actual labor rates rather than the rates State Farm self selects.

195.    The method contains a built in bias towards the rates of larger shops or shops with more than one location as such facilities have greater capacity, more work bays and more technicians.  As the number of work bays or technicians determines State Farm's "half plus one" results, it becomes imperative for larger shops' labor rates to conform to State Farm's predetermined

outcome, which State Farm ensures they do.

196.    Plaintiff Capitol Body Shop, for instance, which operates four locations, has had its labor rate unilaterally changed and reduced by State Farm.

197.    Additionally, the method makes no provisions for work quality, equipment, quality of personnel or any other factor. State Farm's method does not provide a range of going rates, it produces only one. Therefore the worst shop in State Farm's determined (and undisclosed) market area is paid exactly the same as the best shop. Shops without equipment necessary to handle aluminum repairs are paid exactly the same as those with the current equipment needs. DRP shops with numerous complaints and history of repeatedly performing substandard repairs are paid exactly the same as those who perform superior service.

198.    State Farm does not disclose or make publicly available the geographic area it determines is a given "market area." State Farm can and does alter a given "market area" to further manipulate the results or to punish a particularly noncompliant shop by including it in a different market area with lower rates.

199.    For instance, after Plaintiff Lakeshore Body Shop raised its rates and questioned parts practices and State Farm's refusal to pay for necessary procedures, State Farm reallocated Lakeshore Body Shop to a different market area with a lower "market rate." State Farm reduced the labor rate it paid Lakeshore to conform with this new "market area." Within weeks, other insurers reduced their rates paid to Lakeshore, as well.

200.    State Farm does not publish or otherwise make publicly available its "survey" results. State Farm has, in fact, made significant efforts to keep this and other internal information confidential. State Farm does not even disclose to its claims team leaders the criteria for determining

a "market area" or the criteria for changing a "market area."

201.    Even in litigation, State Farm habitually obtains blanket protective orders for all information produced in discovery on the grounds that training manuals, policies and procedures and internal processes constitute trade secrets, proprietary information or confidential information. See, e.g., *Hover v. State Farm Mut. Auto. Ins. Co.*, 2014 U.S. Dist. LEXIS 119162 (E.D. Wa. 2014), *Akins v. State Farm Mut. Auto. Ins. Co.*, 2011 U.S. Dist. LEXIS 82806 (E.D. Mich. 2011), *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003), *Hamilton v. State Farm Mut. Auto. Ins. Co.,* 204 F.R.D. 420 (S.D. Ind. 2001).

202.    Despite the fact that State Farm does not make its results publicly available, the other named Defendants–who, again, do not conduct any form of survey–pay only what State Farm pays while calling it the "market rate."

203.    For instance, in 2011, Plaintiff Capitol Body Shop's rates were posted as $50.00 per hour for body, refinish, and paint and materials. Capitol is located in Jackson, central Mississippi. Plaintiff Smith Brothers' posted rates were $46.00 per hour for body and refinish and $38.00 per hour for paint and materials. Smith Brothers is located in the south/southwest of Mississippi, not far from the Louisiana border. Plaintiff Pitalo's posted rates in 2011 were $46.00 per hour for body and refinish and $32.00 per hour for paint and materials. Pitalo's is located in Ocean Springs, the extreme southern/southeastern part of Mississippi. Plaintiff Bill Fowler's had posted rates in 2011 of $44.00 per hour for body and refinish and $35.00 per hour for paint and materials. Bill Fowler's is located in Southaven, the extreme north of Mississippi, just a few miles from the Tennessee border.

204.    These examples show the expected variance across the state as population, demand

and markets vary. While Mississippi's population is relatively small, there are over 360 miles between Southaven and Ocean Springs. This is more than the distance between Jacksonville and Miami, by way of comparison.

205. Despite this distance and variance, and the fact that no Plaintiff charged less than $44.00 per hour, State Farm had determined the market rate was $42.00 per hour for body and refinish labor and $35.00 for paint.

206. Defendants USAA, Shelter, SAFECO, Nationwide, Progressive, GEICO, Direct General and Allstate also all paid $42.00 per hour.

207. None of the Defendants in the immediately preceding paragraph conduct labor rate surveys.

208. None of the Defendants in Paragraphs above contacted the Plaintiffs over the last five years to ask what their current posted rates were.

209. As noted above, State Farm also purports to establish market rates based upon "market area." This would presumably account for variations across metropolitan areas as well as discrete areas of a given state, such as Mississippi.

210. However, under State Farm's method, there is apparently no variability anywhere within the State of Mississippi, as it determined the market rate of $42.00 per hour for the entire state. This was the "market rate" even though the Plaintiffs' posted rates show regional variation.

211. The distance between these areas covers tens of thousands of square miles and numerous population centers, large and small. Despite there being demonstrable differences in the rates charged throughout the state, the named Defendants as set forth in the preceding paragraphs, all assert the "market rate" in the "market area" was not only less than publicly posted rates but was

less than publicly posted rates based upon data which could only have been provided by State Farm to its ostensible competitors.

212.    The odds of all the Defendants independently reaching the same conclusion as State Farm without conducting even a pro forma survey would be outside the realm of possibility. This is even more obvious when one considers the possibility of reaching an identical conclusion to that of State Farm when State Farm's conclusion is based upon a labor rate State Farm manipulates and creates via a fatally flawed methodology.

213.    In addition to the above, available documents establish both conformity with and foreknowledge of a change in State Farm's <u>unpublished</u> "market rates" by the other Defendant insurers.

214.    In mid-October, 2011, State Farm increased its price ceiling for labor rates from $42.00 per hour to $44.00 per hour. Within a few weeks, Defendants USAA and Shelter had raised its ceiling to $44.00 per hour.

215.    When State Farm raised its price ceiling to $46.00 per hour in the summer of 2012, by autumn, Defendants Shelter, USAA, Safeco, Mississippi Farm Bureau, Nationwide, GEICO and Allstate had set their respective price ceiling at $46.00 per hour.

216.    There the "market rate" has stayed, all across the State of Mississippi. Even though Plaintiffs Capitol Body Shop and Clinton Body raised their rates to $75.00 per hour in 2014, Bill Fowler raised its rates October, 2014 to $48.00 per hour, Pitalo's raised its rates to $50.00 per hour in 2014, and Smith Brothers raised its rates in July, 2012 to $50.00 per hour and to $65.00 per hour in December 2014.

217.    Again, none of these Defendants conduct an independent survey of their own of body

shop labor rates. Again, State Farm purportedly does not publish or otherwise make publicly available its survey "results."

218. As the new "market rate" still did not reflect known actual posted rates, the decision finding a "new market rate" could only have been provided by State Farm's internal and unpublished numbers to the other Defendants, based upon State Farm's own decision as to what the "market rate" should be rather than a reflection of what the market actually was in 2014.

219. Nor can the consistent price fixing be explained by variability within a given area. On a macro level, it is immediately apparent that rates are substantially different within the metropolitan Jackson area than they are in either north or south Mississippi, which vary from each other.

220. On a micro level, Plaintiffs Capitol and Clinton together comprise 40-50% of the body shop capacity in metropolitan Jackson and thus their rates should substantially affect any legitimate mathematical calculation of labor rates in the metropolitan Jackson area. Plaintiffs Smith Brothers and East McComb together constitute approximately half the body shops in the entire town with rates higher than the Defendants' "market rate."

221. In other words, the math simply does not work to make the "market rate" the result of independent acts by the Defendant insurers. To reach identical results as the Defendants have, it can only be reasonably concluded State Farm determines the false market rate and provides the same to the remaining defendants.

222. Over the last twenty years, in addition to manufacturing a "market rate," the Defendants have utilized other methods of intimidating the Plaintiffs and other body shops to suppress labor rates.

223.    Shops are frequently told they are the only shop trying to raise their rates, therefore the posted rates do not conform with "market rates" and the Defendants refuse to pay the posted rates. As shown by the above rates examples, Defendants assertions are false. Defendants who have told Plaintiffs this include but are not limited to State Farm, Allstate, GEICO, Progressive, Farm Bureau, Nationwide, Direct General, SAFECO and USAA.

224.    Statements about being "the only one" have been made by the Defendants named in the preceding paragraph to, but not limited to, Plaintiffs Clinton Body Shop, Capitol Body Shop, Bill Fowler's, Lakeshore, Pitalo's, Smith Brothers, Bolden, Boler-Phillips, Richie's, Hardin's, Alexander's and Walker's.

225.    Defendants have threatened Plaintiff shops and others that if they discuss labor rates with each other, they will be price fixing and breaking the law. Statements to this effect have been made by Defendants State Farm, GEICO, Progressive and Allstate specifically but not limited to Plaintiffs Capitol, Clinton, Bill Fowler's, Smith Brothers and Bolden.

226.    Plaintiffs believe the forgoing facts are sufficient to establish the probability of a combination or conspiracy and that discovery will adduce additional information showing the Defendants have intentionally acted in concert, combination and by agreement to fix and suppress the labor rates of the body shop industry in Mississippi.

B.    Repair Processes and Procedures

227.    The Defendant insurers have over the course of years exerted their combined market share power to refuse payment or full payment for repair processes and procedures required to return vehicles to pre-accident condition.

228.    This failure constitutes a selective failure by Defendants to follow collision repair

-42-

industry standards for auto repairs, even though as insurers, the Defendants have no expertise in making auto collision repair standards, nor legal authority to do so.

229. Three leading collision repair estimating databases are in ordinary usage within the auto body collision repair industry:

a) ADP or Audatex;

b) CCC; and

c) Mitchell.

230. These databases provide estimates of required processes, procedures, parts, materials and other necessary components as well as estimated times for completing the various repair components necessary to return a vehicle to its pre-accident condition.

231. In addition, the databases identify and separate procedures as either "included operations" or "not included operations." Included operations are billed as part of the larger process or procedure. Not included operations are billed separately from the larger process or procedure.

232. These databases and the estimates they generate are accepted within the body shop industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability between the "best-case scenario" presented by the procedure databases and the actual needs of a particular repair.

233 Though not exclusively, variability is most often encountered in the amount of time required to complete a particular process or procedure, rather than the necessity of a particular process or procedure.

234. By default, database estimates are underestimates of actual repair times and materials. The database procedure pages set forth the anticipated repairs, repair times and materials for repair

of an undamaged vehicle using original manufacturer equipment which are specifically designed to fit that particular vehicle. Wrecked cars are obviously not undamaged vehicle and original manufacturer parts are not always used, which can substantially affect real world repair procedures required, repair times and necessary materials. It is, for instance, much faster and easier to remove an undamaged door from an undamaged vehicle than it is to remove a wrecked door from a wrecked vehicle, where removal often requires prying the damaged components apart from each other before they can be removed from the vehicle.

235. Historically, these procedure databases were printed and distributed in hard copy to subscribers. Throughout the industry, they were referred to as "procedure pages" or "p-pages."

236. Although now housed in electronic form as computer databases, they are still popularly referred to as "p-pages."

237. All of the Plaintiffs subscribe to one or more of these databases and use the same to generate estimates for individual repairs. For example, Plaintiffs Pitalo's uses Audatex/ADP, Crystal Car Care, Richie's and Clinton use Mitchell, George Carr, Smith Brothers and Walker Collision uses CCC. Historically, there has been very little variability between the contents of the various databases; selection was generally made upon price point, individual preference and ease of use.

238. Upon information and belief, CCC is currently or has been used by Defendants USAA, GEICO, Allstate, Safeco, Shelter and Nationwide.

239. Upon information and belief, Mitchell is currently or has been used by Defendants Progressive, Mississippi Farm Bureau, National General, State Farm and Allstate.

240. Upon information and belief, ADP/Audatex is currently or has been used by

Defendants State Farm.

240.     Documents currently available show Defendants USAA and Shelter often use independent appraisers, who utilize one or more of the three databases.

241.     Over the course of years, the Defendants have admitted the accepted position of the estimating databases within the industry, either through their own consistent use of these databases or more explicitly, as State Farm has done.

242.     As much as twenty years ago, State Farm assured the body shop industry it does and would continue to abide by the standard operations of the "p-pages."  Sitting on a panel discussion at the 1994 National Autobody Congress and Exposition, State Farm speaker Gerry Westerfield answered a question of how to handle State Farm adjusters who refused to pay for standard "p-page" operations with the following:

243.     "If a State Farm representative comes to your shop and says, 'We don't pay for that, it's company policy,' take it from me, we don't have that policy.  . . .  So tell them, 'I know your policy and that's not it.  Who's your supervisor?'"

244.     More recently, many of the Plaintiffs met with Tim Bartlett (State Farm Estimatix team leader), John Findley (Estimatix section manager), Steve Simkins (State Farm counsel for Mississippi and Alabama), and members of the Mississippi Department of Insurance in April, 2013.

245.     At this meeting, members of the automobile collision repair industry expressed their dissatisfaction and concerns with the very practice of refusing to compensate fully and fairly for repairs that were performed and State Farm's inconsistent application of the database estimating software, i.e., utilizing database estimates only when it is in State Farm's financial best interests to do so.

246.    State Farm representative Tim Bartlett acknowledged (before witnesses) that repairs and subsequent payment for those repairs should be consistent with the estimates prepared through the database software. Mr. Bartlett assured those present, and the Department of Insurance representative, that it would begin abiding by those database estimates and stated it would raise the matter at its insurance industry meetings, held locally approximately once a month.

247.    Also at that meeting, Mr. Simpkins asked if insurance representatives might be permitted to attend the meetings of the Mississippi Automobile Collision Society. The association representative present for the meeting, John Mosley, invited State Farm to attend those Association meetings if State Farm would permit members of the Association to attend the insurance meetings. Mr. Simkins refused.

248.    Despite the assurances given the body shop representatives and the Department of Insurance at this meeting, State Farm has failed to perform as promised.

249.    Despite public endorsement and daily use of the databases, the Defendants have nonetheless engaged in a course of conduct of refusing to make full payment for procedures and processes. In many instances the Defendants will refuse to allow the body shop to perform required procedures and processes, thereby requiring the Plaintiffs to perform less-than-quality work or suffer a financial loss.

250.    A non-exhaustive list of procedures and processes the Defendants refuse to pay and/or pay in full is attached hereto as Exhibit "2."

251.    At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage. For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen

hours of labor is standard for that type of repair, Defendant will cite the database estimate and pay for only fifteen hours of labor time.

252. Alternative but collateral to the above, Defendant insurers will alter the database estimates, unilaterally reducing either labor time or materials needed. Manual changes to database standards are automatically marked by the program either by underlining or an asterisk so there is no mistake as to an item being altered.

253 Defendant insurers will designate these as "judgment items" without any further authority or justification.

254. Quite often, though certainly not exclusively, these changes will be made by a Defendant insurer representative who is conducting a "desk review" of the shop repair estimate, without ever having personally seen the vehicle in question. Although not limited to USAA, USAA has quite frequently utilized their "Audit Service," which views the estimate and arbitrarily reduces each estimate by an average of twenty-five percent, reducing estimates and eliminating procedures without ever viewing a vehicle.

255. However, the most common tactics for refusing to pay for necessary processes and procedures include, but are not limited to, simply refusing payment by making the false statement that a particular operation isn't a necessary operation, or the false statement that a particular operation is an included operation in another procedure and therefore payment for one is payment for both, or the false statements that either no other body shop in the area performs that operation or no other body shop in the area bills for that operation.

256. Processes and procedures are routinely excluded by the Defendant insurers, though when performed, they are necessary to return a vehicle to pre-accident condition. The databases

specifically note these procedures are <u>not</u> included in other repairs or refinish procedures and thus must be billed and paid as separate items.

257.    Examples of the foregoing include the following:

•    Feather, prime and block: This procedure is a refinish operation that completes bodywork repair from 150 grit smoothness to the condition of a new undamaged panel.  While this procedure is not required on every repair, when it is performed, all three databases clearly state it is <u>not</u> an included operation and it is a refinish operation.
•

258.    Defendants State Farm, Progressive and USAA, among others, have historically consistently refused to pay for this procedure in its entirety to most of the Plaintiffs on the ground that it was an included body labor operation.  Defendants GEICO and Nationwide began paying for this procedure either shortly before or shortly after this lawsuit was originally filed.

259.    Within the last few weeks, State Farm has begun writing on estimates for payment of feather, prime and block but actually is not doing so.  Instead, it reduces body labor operations by a pre-determined time and labels that carved out time as feather, prime and block.  Again, it is designated a body labor operation, instead of a refinishing operation and the shops are still denied materials compensation as a result.  Calculation for materials is made for refinish operations, not body labor operations. In the end, the shops are still not being paid for the work as State Farm's relabeling only works to change the line item entries, not the bottom line.

•    Denib and finesse (also known as color sand and buff): This refinish procedure is described above. All three databases denote this procedure, when required, is <u>not</u> an included operation.
        220.    Defendants refusing to pay for this procedure include but are not limited to State Farm, Progressive,[33] GEICO, Allstate, National General and USAA.

---

[33]Progressive's record of payment for this procedure is spotty, primarily depending upon the temperament of the individual adjuster. Within the last several weeks, Progressive has announced a complete halt to payment for this work.

All of the Defendants refuse to pay for seatbelt safety checks, test drives and cleaning a vehicle before returning to the owner.

### 3. Paint and Materials

260.    As described above, traditionally, paint and materials have been compensated at an hourly rate. Separate and apart from paint labor rates, paint and materials rates were intended to compensate shops for the actual cost of paint and materials used in a repair.

261.    However, as also described above, contemporary vehicle finishes and the materials necessary to complete repairs have costs which have outpaced the traditional method. While it is inarguable materials must be expended to repair automobiles, the Defendants simply refuse to pay for them or pay fully the paint and materials costs submitted, asserting additional costs are part of the cost of doing business. This is the Defendants' position even when the authoritative databases specifically state that such materials are <u>not</u> included in the repair operations.

263.    The vast majority of the named Defendants continue with the traditional method. As of January, 2015, Defendants State Farm, Geico, Allstate, USAA, Progressive, Mississippi Farm Bureau, Direct General, Nationwide, Shelter were all paying a paint and material rate of $35.00 per hour. This was consistent across the entire State of Mississippi.

264.    All of the Defendants assert the paint and material rate they pay is the "going rate" or "market rates" in the area.

265.    However, none of the Defendants conduct any review of body shop posted rates to determine an area's "market rates," with the exception of State Farm. As described in detail above, however, State Farm's method of determining rates is to create them out of whole cloth. This is supported by the fact that Plaintiffs' posted rates are all higher than the purported "prevailing rate"

and the utter lack of variability across the entire state of Mississippi, though posted labor rates do vary by region, as one would reasonably expect.

266.     As also noted above, State Farm does not publish or otherwise make publicly available the results of its purported surveys.

267.     Despite there being demonstrable differences in the rates charged throughout the state, the named Defendants, all assert the "market rate" in the "market area" was not only less than publicly posted rates but was exactly the same as the rate State Farm concluded was the "market rate" based upon its purported, unpublished survey.

268.     The odds of all the Defendants independently reaching the same conclusion as State Farm without conducting even a pro forma survey of their own are outside the realm of possibility. This is even more obvious when one considers the probability of reaching an identical conclusion to that of State Farm when State Farm's conclusion is based upon a labor rate State Farm manipulates and creates via a fatally flawed methodology.

269.     In addition to the above, available documents establish both conformity with and probable foreknowledge of a change in State Farm's unpublished "market rates" by the other Defendant insurers.

270.     As set out above, in mid-October, 2011, State Farm increased its price ceiling for labor rates from $42.00 per hour to $44.00 per hour.  Within a few weeks, Defendants USAA and Shelter had raised its ceiling to $44.00 per hour.

271.     When State Farm raised its price ceiling to $46.00 per hour in the summer of 2012, by autumn, Defendants Shelter, USAA, Safeco, Mississippi Farm Bureau, Nationwide, GEICO and Allstate had set their respective price ceiling at $46.00 per hour.

272.     Again, none of these Defendants conduct an independent survey of their own of body shop labor rates.  As the new "market rate" still did not reflect known actual posted rates, the decision finding a "new market rate" could only have been provided by State Farm's internal and unpublished numbers distributed by it to the other Defendants, based upon State Farm's own decision as to what the "market rate" should be rather a reflection of what the market actually was in 2014.

273.     The Defendants have been provided with invoices showing the actual cost of paint exceeds the entirety of compensation received and prices fixed by the Defendants.   Uniformly, this has been ignored by the Defendants.  The price ceilings imposed by the Defendants are forcing body shops to operate at a loss for every car that is painted while Defendants profit by these fixed prices.

4.      Parts

274.     Numerous sources have found aftermarket parts inferior to OEM parts.  As noted above the California Bureau of Automotive Repair  found aftermarket parts inferior and the majority of them simply did not fit.

275.     Ford Motor Company  has conducted crash tests comparing OEM crash part performance to aftermarket crash part performance.  The results, which are publicly available, found that not only did aftermarket parts fail to perform at the same level, but repair costs on vehicles fitted with aftermarket parts were often double that of OEM parts.

276.     Consumer Reports reached the same conclusion, a report also publicly available.

277.     Safety issues are particularly paramount in replacing crash related parts.  Salvaged parts are not subject to any safety testing requirements or regulations.  They are, by definition, parts removed from other vehicles, almost exclusively vehicles which have already been wrecked and

most frequently vehicles which have been damaged so badly as to be declared total losses.

278.    State Farm has recognized the safety issues associated with crash related parts by writing into its DRP language that "the following crash related parts, when subject to certification standards developed by an organization approved by State Farm, will be certified unless requested by the vehicle owner:

      -bumper components
      -lighting components
      -radiator supports/tie bars and associated mounting components
      -outer sheet metal and plastic/composite parts."

279.    Despite this, State Farm regularly and routinely writes estimates compelling use of salvaged bumper components, lighting components, radiator supports for repairs conducted at Plaintiffs' shops.  Examples include:

- Remanufactured (salvaged) bumper covers, front and rear, and salvaged bumper assemblies
- Used side panels (salvaged)
- Salvaged radiator panel, crossmember
- "Recycled" (salvaged) headlamp assembly and side marker lens
- Salvaged headlamp panel
- Salvaged tail lamp assembly
- Salvaged radiator supports

280.    Other insurers have publicly recognized the safety issues with using crash-related salvaged parts.  Farmers spokesperson Kitty Miller has publicly stated, "Farmers does not use salvage parts to replace axles, suspensions, or transmissions.  Most salvage parts are external sheet-metal parts."

281.    This is not a truthful statement.  The Farmers companies regularly require use of salvaged crash related parts including radiator supports, radiator assemblies, hoods, bumper assemblies, and fender assemblies in estimates written for repairs throughout the nation.

282. While Farmers is not a party to this particular action, the public statements solidify the acknowledgment by the insurance industry of the importance of crash-related parts, at least publicly. In reality, the Defendants do not put these safety concerns and acknowledgments into practice.

283. In addition to the examples above, Progressive has written estimates at one or more Plaintiff shops requiring use of salvaged rear suspension axle assembly–the equipment which keeps the wheels attached to a vehicle. Progressive has also written for salvaged or "remanufactured" bumper covers, salvage tail lamps, headlamp assemblies, hoods and fender panels.

284. Defendant GEICO writes estimates requiring use of salvaged or "reconditioned" wheels. Shelter will write for salvaged engine blocks. Allstate writes estimates for salvaged fenders, salvaged headlamp and tail lamp assemblies, bumper covers.

285. These are only examples, and are not intended to set out the entire universe of such actions by all Defendant insurers.

286. The insurance-industry wide practice of insisting on aftermarket parts, which are materially inferior and simply do not fit, or salvaged parts of dubious or unknown provenance, history and prior damage places Plaintiffs in the untenable position of either performing a repair with unsafe parts or performing safe repairs at their own expense.

287. Despite the well-publicized advertising statements of insurers such as State Farm, GEICO, and Allstate, among others, that "guarantee" their repairs for as long as the consumer owns the repaired vehicle, these companies' own documentation disclaims this purported guarantee specifically with respect to aftermarket and salvaged parts.

288. Defendant Progressive's repair estimates carry the warning, "This estimate has been

prepared based on the use of crash parts supplied by a source other than the manufacturer of your motor vehicle. The aftermarket crash parts used in the preparation of this estimate are warranted by the manufacturer or distributor of such parts, rather than the manufacturer of your vehicle."

289.     On the same page, Progressive clarifies exactly what part of repairs come with a lifetime guarantee: "sheet metal and plastic body parts." That's it. Nothing else is guaranteed and other language makes clear Progressive does not warrant the aftermarket parts it requires to be used. That must be taken up with the manufacturer or distributor, if a consumer is able to identify the manufacturer or distributor.

290.     Allstate's documents also contain limiting language. "The insurance company guarantees the fit and corrosion resistance of any aftermarket/competitive outer body crash parts that are listed on this estimate and actually used in the repair of your vehicle for as long as you own it. If a problem develops with the fit or corrosion resistance of these parts, they will be repaired or replaced at the insurance company's expense."

291.     That is all. If an exterior non-OEM part comes lose or rusts, Allstate will repair or replace it. If a salvage or aftermarket radiator support, bumper assembly, hood hinges, steering column or assembly, air bag or air bag sensor installed at the insistence of Allstate fails, Allstate has no liability under its purported guarantee.

292.     The immediate cost to the Plaintiffs is the loss of revenue and time lost in modifying aftermarket parts to fit, which the Defendants refuse to pay. With salvage parts, the shop must clean and often repair the parts prior to use, when they are usable, and that is also time and labor which the Defendant insurers refuse to compensate the Plaintiffs.

293.     The ultimate outcome of the limiting language used by the Defendant insurers is the

body shops shoulder the immediate liability burden for failure or inadequacy of parts they had no voice in choosing.

294.     For shops which do remain associated with direct repair programs, the threat and potential cost is even greater.  Most DRP terms, such as those of State Farm, USAA, and Progressive, require the shop to not only maintain an extensive liability policy with the DRP sponsor as a named insured, (for which the shop bears solely premium payment responsibility) but also contain language requiring the shop to assume liability for any problems arising from parts selection and/or usage, and agree to indemnify the sponsoring insurer in the event the insurer is found liable for its own action with regard to parts.

295.     Again, in the face of the combined market power exerted by the Defendants and their unified insistence on use of aftermarket or salvage parts, the only recourse a shop has is purchase appropriate parts and work at a loss on each such repair.

296.     Each of the Defendants require use of insufficient, improper, ill-fitting or dangerous parts.  Requiring use of such parts damages Plaintiffs by the necessary expenditure of labor time and materials to make the parts fit or "rehab" the parts sufficient for use.  The Defendants refuse to compensate Plaintiffs for either labor or materials expended, thereby damaging the Plaintiffs directly and immediately in pecuniary losses.

297.     Where Plaintiffs refuse to utilize insufficient, improper, ill-fitting or dangerous parts so as to effectuate a complete and safe repair, the Defendant insurers refuse to pay the actual cost of the parts used.  Defendants will only pay the amount for which the insufficient, improper, ill-fitting and/or dangerous part could have been purchased.  The Defendants refusal to compensate Plaintiffs for the actual cost of repairs damages Plaintiffs directly and immediately in pecuniary losses.

## STEERING

298.    Within the body shop and insurance industry, "steering" is the term used to describe the practice of insurers of coercing or otherwise convincing a consumer to withhold patronage from a disfavored repair shop for failing to comply with fixed prices.

299.    Steering generally takes the form of an insurer relaying false or misleading information to a consumer after the consumer has identified a noncompliant target shop as the repair facility the consumer wants to perform repairs.  Insurers will also steer using threats of economic consequences to the consumer if they persist in using the identified shop of their choice.

300.    Regardless of which insurer is involved, the Defendants' insurance representative ordinarily provides the same list of false or misleading "information" to consumers after they have selected one of the Plaintiffs' shops as their choice of repair facility.  Examples of these statements include but are not limited to the following:

•    The selected shop is not on the insurer's preferred list;
•    The insurer has received complaints about the quality of the shop's work;
•    If the consumer takes their vehicle to the selected shop, repairs will take too long and the consumer will run out of rental car time and have to pay for a rental out of their own pocket;
•    The selected shop charges too much and the consumer will have to pay the difference;
•    The insurer has received complaints about that particular shop from other consumers.
•    The consumer is required to take their vehicle to an approved facility for an estimate before they are allowed to go to the repair facility the consumer has identified as the repair facility of their choice.
•    The insurer will provide a guarantee on repairs performed at its preferred shops but will not guarantee the work performed at the selected shop.

301.    With respect to the statement that a consumer must visit a preferred shop for an estimate before proceeding to the shop of choice for repairs, while all Defendants engage in this practice to some degree, GEICO appears to be the most aggressive.  GEICO claims handling documents refer to this as "capture and retention."  If the GEICO employee handling the claim is

successful at directing a vehicle to one of its direct repair shops for an estimate, the file is marked as a successful "capture." If GEICO successfully compels repairs at the facility which "captured" the vehicle, this is designated a successful "retention." GEICO internal documents repeatedly urge employees to capture and retain, directly tying such success to increased company profits and increased profit-sharing bonuses for employees.

302. The degree of steering has varied over the years but can be rather definitively linked to certain actions by Plaintiffs and motives by Defendants, set out further below.

303. Examples of steering, failed and successful, include but are not limited to the following:

304. In 2014, Candace Soodad identified to Shelter Insurance she had taken her car to Plaintiff Bolden Body Shop for repairs. Shelter employee "Wendy" stated she was "skeptical" of Bolden and the consumer should have waited until after speaking with Shelter before dropping her car off for repairs. "Wendy" further stated repairs at Bolden would take a long time.[333] Ms. Soodad insisted she would have Bolden repair her vehicle.

305. In early 2014, Gail Hampton notified State Farm she was taking her vehicle to Plaintiff Alexander's Body Shop for repairs. State Farm told her she was <u>required</u> to take her vehicle to an approved shop for an estimate before taking the vehicle to Alexander's for repairs. The two shops State Farm said she could take her vehicle to for an estimate were far away, one in Jackson, Mississippi, and the other in Louisiana. Ms. Hampton argued the distance and insisted she wanted

---

[333]Shelter's steering is particularly indicative of intent to intentionally harm Plaintiffs since Shelter announced in 2014 it had disbanded its DRP. In the absence of a DRP, there are no "preferred" shops to which Shelter should be able to steer. The only reason to steer or attempt to steer customers from Plaintiffs' shop is to intentionally interfere with and harm Plaintiffs' businesses.

to go to Alexander's but State Farm told her she had no choice but to comply. Ms. Hampton took

her vehicle to the Jackson shop as it was closer than the shop in another state and ended up leaving

the vehicle there for repairs because the distance was so great, took up so much time and effort and

she was a senior citizen. Ms. Hampton would have consummated the business with Alexander's but

for State Farm's illegal insistence she had to take her vehicle to another shop for an estimate because

Will Alexander, owner/operator of Alexander's Body Shop, is Ms. Hampton's nephew.

306.    In a separate incident in 2014, State Farm told Martin Hampton he was required to

take his vehicle to an approved shop for an estimate before he was allowed to go to Alexander's

Body Shop for repairs. Mr. Hampton argued with State Farm, telling State Farm he only wanted to

go to Alexander's but State Farm said Mr. Hampton had no choice. Mr. Hampton complied as he

was told he had no choice. Because of the distance of the State Farm shop he was compelled to go

to, the time, effort and difficulty, Mr. Hampton capitulated and left his vehicle for repairs at the State

Farm preferred shop. Mr. Hampton would have consummated the business with Alexander's but

for State Farm's illegal insistence he had to take his vehicle to another shop for an estimate because

Will Alexander, owner/operator of Alexander's Body Shop, is Mr. Hampton's nephew.

307.    Swatiben Desai told Progressive she was taking her vehicle to Plaintiff AutoWorks

Collision for repairs in early 2015. Progressive told Ms. Desai that AutoWorks would charge her

more for repairs, that if she didn't go to their preferred shop, she would be liable for storage fees, that

she would have to pay more for repairs if she went to her preferred shop, that if she went to their

preferred shop, Progressive would guarantee the work but would not if she went to the shop of her

choice. Ms. Desai capitulated to the pressure and took her vehicle to Progressive's preferred shop,

Service King, in Jackson for an estimate, where Progressive persistently told her to leave the vehicle

at Service King, "because you're already here, it makes more sense."

308.    Again, Ms. Desai capitulated to the pressure and left her vehicle with Service King. When it was returned to her, Ms. Desai immediately noticed several problems with the repairs and took the vehicle to AutoWorks, where she had stated to Progressive she wanted to go in the first place.  After inspecting the vehicle, AutoWorks found unrepaired damage to the front end, the vehicle was out of alignment and pulled to the right, the engine cradle bolts were not properly replaced, welds were incomplete and without corrosion protection, the air conditioner condenser was not properly installed or recharged.  Overall, the safety of the vehicle after Service King repairs was compromised.

309.    Ms. Desai would have taken her vehicle to AutoWorks for the initial repairs but for Progressive's interference.

310.    Consumer Kerri Mitchell identified Plaintiff Walkers Collision as her chosen repair facility to Progressive in January, 2015.  Progressive told her that if she took her car to a preferred shop, Progressive would guarantee the repairs for life.  Progressive further told Ms. Mitchell that she was _required_ to choose from one of three repair facilities, one in Louisiana, one in Gulfport (over an hour away) or one local.  Ms. Mitchell did not wish to use any of those, she wished to use the local shop she had selected but, based upon Progressive's statements that she had to use one of the three shops they named, she felt she had no choice if she wanted her car fixed.  Ms. Mitchell would have done business with Plaintiff Walkers but for Progressive's interference.

311.    Consumer Joseph Compretta told State Farm he was taking his vehicle to Plaintiff Lakeshore for repairs.  State Farm told Mr. Compretta that Lakeshore was not "on our list," said they couldn't find it in the computer, asked where it was located, what was the phone number, the address

and other questions. Mr. Compretta had to insist several times he was going to Lakeshore for repairs before State Farm ceased saying they didn't know that shop and processed his claim.

312.    State Farm told consumer Lauren Inman if she went to the shop she had chosen for repairs, Plaintiff Walkers, that she would have to pay more, that repairs would take longer and Walker's wasn't on their preferred list. Ms. Inman was also told she should have used State Farm's preferred towing service and preferred rental car company and it was inferred that because Ms. Inman had not utilized the "preferred" providers, State Farm was not going to pay the claim. State Farm further inferred that if she insisted on using Walker's for repairs, State Farm would not pay the claim. Ms. Inman used Walker's Collision anyway.

313.    Laura Johnson identified Plaintiff Lakeshore as the repair facility she had chosen to repair her vehicle to State Farm. Ms. Johnson had already scheduled an appointment with Lakeshore and arranged to drop off her vehicle. However, before the vehicle was actually delivered, State Farm called Ms. Johnson and told her she would have to take her vehicle to State Farm's preferred shop in the area, Advantage Collision. Ms. Johnson told State Farm her husband had work done previously by Lakeshore and he had been very pleased with the work. State Farm told Ms. Johnson if she went to Lakeshore, she would have to pay herself for charges State Farm "did not deem reasonable." Ms. Johnson capitulated to State Farm's insistence and did not go to Lakeshore for repairs.

314.    Consumer Lara McFarland identified Plaintiff Hardin's Body Shop as the shop she wanted to perform repairs to her vehicle to State Farm. State Farm told her she would have to pay more if she went to Hardin's, that Hardin's was not on their preferred list, that if she went to Hardin's the repairs would take longer but if she went to their preferred shop, State Farm could pay

the preferred shop directly and the repairs would be faster. Also after identifying Hardin's, State Farm also suggested she would have to drive sixty miles away to get a rental car.

315.    Consumer Jamie Allen had taken her vehicle to Plaintiff Bolden Body Shop for repairs and reported the claim to Defendant Allstate. Allstate told Ms. Allen that if she took her vehicle to one of their preferred shops instead, Allstate could pay the shop directly and it would be faster. Allstate also told Ms. Allen she was <u>required</u> to take her vehicle to a preferred shop or drive-in facility for an estimate before taking her vehicle to Bolden for repairs. Allstate then told Ms. Allen it would arrange to have her vehicle taken away from Bolden and transported to a preferred shop for an estimate and repair.

316.    Consumer Michael Wilson identified Bolden Body Shop as his selected repair shop to Defendant USAA. USAA told Mr. Wilson that Bolden was not on their preferred list, that it would not guarantee the work done by his chosen shop and that Bolden probably would not provide one and USAA couldn't find Bolden "in the system." Mr. Wilson felt coerced and pressured to change his choice, though the attempt was ultimately unsuccessful.

317.    Consumer Donald Perkins was told by Nationwide that Plaintiff Lakeshore was not on their list and if he took his vehicle to one of their network shops, Nationwide would guarantee the repairs for life. Mr. Perkins took his vehicle to Lakeshore anyway.

318.    Consumer Samaria Collins identified Plaintiff Bolden Body Shop as the repair facility she was taking her vehicle to for repairs to GEICO. GEICO told her she was <u>required</u> to take her vehicle to a GEICO-preferred shop for an estimate before she could take her vehicle to the shop of her choice for repairs and that if she stayed at the network shop and let them do the repairs, GEICO would guarantee the repairs.

319.     Consumer Steve Palato took his vehicle to Plaintiff Crystal Car Care for repairs and notified Nationwide of this.  Nationwide insisted Mr. Palato take his vehicle to one of their preferred shops.  When he refused, Nationwide refused to send an adjuster to inspect Mr. Palato's vehicle for over two weeks but also refused to allow Crystal Car Care to begin repairs until it did so.

320.     Mrs. Williams took her vehicle to Plaintiff Crystal Car Care for repairs and notified Defendant State Farm.  State Farm contacted Mrs. Williams and told her they were going to take her vehicle out of Crystal Car Care and move it to a preferred body shop that would perform an estimate and if the vehicle was repairable, the preferred shop would perform the repairs.

321.     Defendants known actions damaged the Plaintiffs by interfering in business relations with their customers and potential customers.  These customers had voiced an actual intention to patronize the Plaintiffs' businesses but the Defendants' pressured, coerced, made misrepresentations about the Plaintiffs and otherwise utilized deceptive means to steer business to preferred shop that would comply with fixed prices and parts procurement ceilings.

322     Defendants actions were intentional, malicious and served no legitimate business interest of their own.

323.     The existence of known instances of both successful and unsuccessful steering and tortious interference by the Defendants reasonably indicates discovery will provide additional instances of successful steering by the Defendants which has harmed and damaged the Plaintiffs. The extent of steering and the extent of damages cannot be adequately determined at this time as the Defendants are in possession and control of the records which will expose their tortious interference.

<u>Defendants' Steering Is Malicious, Punitive in Nature and Intentional</u>

324.     The punitive and malicious nature of Defendants' interference is exemplified by the

failed steering instances described above. In each instance, the Defendant insurer refused to pay the full cost of repairs, either by refusing to pay the posted labor rates, refusing to pay for necessary procedures or processes, utilizing salvaged parts or aftermarket parts instead of OEM parts designed to fit a particular vehicle, capping paint and materials or similar activities, or a combination of these actions.

325.    The outcome was the same–each Defendant paid only what it chose to pay regardless of the actual cost of repairs.

326.    Each Defendant paid only what it would have paid a direct repair or cost-compliant shop. As such, steering becomes a financially pointless endeavor and does not benefit a demonstrably legitimate interest of the Defendants. If each Defendant refuses to pay the full cost of repairs, regardless of where the repairs are performed, steering customers away from Plaintiffs' businesses can only be performed as a means to punish through improper methods and attempts to compel compliance through financial coercion.

327.    Additional evidence of malice is the misrepresentation to consumers that certain difficulties attributed to Plaintiffs are actually and solely the result of the Defendant insurers' own deliberate choice. The statement that repairs will take longer at a Plaintiff shop is not the result of the shop taking longer to complete a repair but a Defendant insurer's decision to delay every part of the repair.

328.    This usually commences at the beginning of the process where the Defendant insurer will delay sending a representative to the shop to perform an initial evaluation but threatens the shop that if work begins before they inspect, payment for repairs will be withheld.

329.    Quite often a Defendant insurer will tell both the customer and the shop an estimator

will be sent, but days or weeks will pass, calls are not returned and when someone finally answers the phone, will again assure all concerned an estimator is being dispatched, again with no result. Only after considerable time has passed will a representative arrive for the initial evaluation, claiming the repair had "just been assigned."

330. A Defendant insurer will next delay in addressing supplements, often stating repeatedly over the course of days or weeks that supplements were never sent by the shop. Even when proof is provided, such as emails or fax confirmation sheets, a Defendant insurer will deny receiving it, further delaying the repair.

331. Even after acknowledging a supplement has been sent, a Defendant insurer will refuse to allow the additional work to commence until an in-person inspection of the supplemental work requested has been made. Again, there are delays in returning to the shop.

332. Alternatively, disagreement between a Defendant insurer and a shop on the scope and extent of repairs results in the insurer invoking the appraisal clause, most often by the insured customer of the Plaintiffs. This results in the insurer waiting days or weeks to send an independent appraiser and/or days or weeks to acknowledge receipt of the appraiser's report, usually the reports prepared by the independent appraisers hired by both the insurer and the consumer.

333. Also reprehensible are the Defendants' assertions that Plaintiffs' work cannot be guaranteed but if the consumer goes to one their network or preferred shops, the insurer will guarantee the work.

334. This is deeply misleading for three reasons. First, no insurance company and certainly none of the named Defendants performs any repair work. Therefore there is nothing for them to guarantee and asserting to Plaintiffs' customers and potential customers they will guarantee

the work is both misleading and inaccurate. As phrased, Defendants' guarantee assertions reasonably lead consumers to believe the repairs are guaranteed by the insurer, which they are not.

335.    A correct statement would be the Defendant insurers require network and preferred shops to guarantee their own work. However, reality has proven that even when repairs are performed at a network or preferred shop, neither the shop nor the insurer can or does live up to even this hypothetical statement.

336.    As set out above, insurers and their network/preferred shops regularly and routinely perform poor work or simply fail to perform necessary repairs at all. Repeat trips for re-repairs usually yield nothing and more than once, failure to make required repairs in at least an adequate manner leads only to both the insurer and the network/preferred shop shrugging and walking away with the repairs incomplete, poor and often leaving a vehicle that is unsafe to drive.

337.    At the same time, these same insurers–who tout guarantees–flat refuse to allow another shop to make repairs. More often than not, "guaranteed" repairs end with a previously reparable vehicle being declared a total loss, sometimes when the vehicle is still beneath the total loss threshold but the insurer simply does not wish to be bothered with it anymore.

338.    Third, Defendant insurers' statements mislead or attempt to mislead Plaintiffs' customers and potential customers into assuming Plaintiffs' do not guarantee their own work. Were this not the intent, to lead listeners to this conclusion, there would be no effect or gain to the Defendant insurers in telling consumers that work done at a network/preferred shop would lead to a guarantee, coupled with disavowal of guarantees at the Plaintiffs' shops.

339.    No legitimate business interest of any of the Defendant insurers allows them to defame the Plaintiffs with falsehoods, accuse the Plaintiffs of misdeeds and malfeasance which is

solely attributable to the insurers' own actions, or financially punish a shop when the cost of their own actions and inactions becomes more than they wish to pay.

340.    These actions are intentional, willful and malicious, conducted by the named Defendants with full knowledge of the falsity of their misrepresentations, without furtherance of a legitimate business interest, justification or lawful purpose and done with the unlawful and unjustified  intent to injure and damage the Plaintiffs individually.

Effect of Defendants' Illegal Steering

341.    As noted above, it is generally well accepted by the courts that insurers exert an enormous amount of influence over where consumers take damaged vehicles for repairs.

342.    Insurance-paying customers constitute between seventy-five and ninety-five percent of a given Plaintiffs' annual business.  Given these proportions, the effect of Defendants' steering is dramatic.

343.    As an example, Plaintiff Clinton Body Shop disassociated from State Farm's DRP in 2013.  Although there had been no change in quality of repairs, equipment or skilled technicians, State Farm immediately began its campaign–telling customers and prospective customers who had identified Clinton as their chosen body shop that State Farm had been receiving complaints about Clinton, that Clinton overcharged, that Clinton took too long to complete repairs, that the customer would have to pay out of pocket for Clinton's overcharging and may run out of car rental coverage, which the customer would then have to pay for, because of Clinton's slow service.

344.    State Farm began telling customers and potential customers these things, though nothing had changed between the Friday Clinton left the DRP and the following Monday when State Farm began steering.

345.    The effectiveness of State Farm's campaign of falsehood and misinformation is shown in the numbers. From 2013 to 2014, the number of jobs Clinton of Richland performed on State Farm claimant and insured vehicles dropped by over sixty percent, from 302 repairs in 2013 and 222 repairs in 2012 to only 114 in 2014.

346.    At the other Clinton Body Shop location, the Plaintiff experienced the same precipitous drop, from 731 repairs in 2012 and 888 repairs in 2013, to half that at 485 repairs in 2014.

347.    At the same time, the Clinton Plaintiffs disassociated from the Shelter Defendants' DRP. They had similar drops: Clinton lost nearly sixty percent of its Shelter-paid customers, dropping from 124 jobs to only fifty four. Clinton of Richland lost fifty percent of its Shelter-paid customers, dropping from thirty seven repairs to a mere eighteen.

348.    Plaintiff Bill Fowler's also experienced substantial steering when it disassociated from Shelter's DRP. Bill Fowler's revenue from Shelter-paid repairs averaged approximately $116,500.00 per year until it withdraw from Shelter's "SOS" program in the spring of 2009. In 2010, Shelter-insured or claimant revenue dropped immediately by over twenty-five percent (25%) to $82,000.00 and has fallen steadily ever since such that in 2014, those revenues had dropped by nearly eighty percent (80%) to barely over $27,000.00.

349.    Thus while it may be an essentially benign statement that up to seventy-five percent (75%) of Plaintiffs' business comes from insurer-paid repairs, when placed in context the numbers are striking. Losing fifty, sixty or seventy percent of (50-60-70%) of one's revenue sources leaves the Plaintiffs' businesses in financially perilous waters and substantially affects the ability of most to remain open as a going concern.

350. This is even more apparent when recalling the named Defendants effectively control over seventy five percent (75%) of the private passenger insurance market and exert substantial control over where insureds and claimants take their vehicles for repairs.

351. Defendants actions are intentional, willful and malicious, conducted by the named Defendants with full knowledge of the falsity of their misrepresentations, without furtherance of a legitimate business interest and done with the intent to injure and damage the Plaintiffs individually.

<u>Unity of Action by Defendants</u>

352. Steering against noncompliant shops is not limited to retaliation by insurers whose DRPs a Plaintiff shop has left. The Defendants share this information amongst and between themselves and steer business away from noncompliant shops as a group. Noncompliant shops are specifically targeted by the group of Defendant insurers.

353. As noted above, Plaintiffs Clinton Body Shop and Clinton Body Shop of Richland left State Farm and Shelter DRPs in 2013. The drop in business from insureds and claimants of those two Defendant insurers is set out above.

354. That, however, is not the entire story. Though neither Clinton shop was on their DRPs, both Plaintiffs suffered distinct losses of customer from <u>other</u> defendant insurers, who had also begun steering business away.

355. Clinton lost nearly half its business from Defendant Mississippi Farm Bureau insureds and claimants from 2013 to 2104, twenty percent (20%) of its business with non-party Liberty Mutual, thirty percent (30%) of its Nationwide insured and claimant customers and twenty percent (20%) of its Progressive insured and claimant customers.

356. Clinton of Richland lost twenty percent (20%) of its GEICO insured and claimant

customers, ten percent (10%) of its SAFECO insured and claimant customers,[3333] fifty percent (50%) of its Nationwide insured and claimant customers, fifty percent (50%) of its USAA insured and claimant customers and fifteen percent (15%) of its Progressive insured and claimant customers.

357    Neither Clinton or Clinton of Richland were associated with these other Defendants' DRP at the time they left State Farm and Shelter in late 2013, yet they began steering customers away from the Clinton Plaintiffs at the same time State Farm and Shelter did so–that is, when the Clinton Plaintiffs left their DRPs.

358.    Plaintiff Bill Fowler's experienced the same group boycotting after leaving Shelter's DRP in 2009.  It's revenue from Mississippi Farm Bureau insureds and customers dropped by nearly thirty percent (30%), State Farm insured and claimant-generated revenue dropped by over sixty percent (60%), Allstate insured and claimant-generated revenue dropped by over seventy five percent (75%) and Progressive insured and claimant-generated revenue dropped by nearly thirty percent (30%).

359.    Steering is not limited to shops which have left DRPs.  Shops, such as Bolden Body Shop, which is not associated with any DRPs has also suffered the shared wrath of the Defendant insurers, as the examples set out above show.

360.    The same is true for Plaintiff Lakeshore, Plaintiff Alexander Body Shop, Plaintiff Crystal Car Care or Plaintiff AutoWorks.

361.    In the absence of some notice by State Farm and Shelter that Plaintiffs Clinton, Clinton of Richland, and Bill Fowler's were no longer "protected," the sudden onset of steering by insurers who had no reason to engage in defamatory actions prior to the disassociation makes no

---

[3333]SAFECO is a subsidiary of non-party Liberty Mutual.

sense.

362.     Significantly, while State Farm, Allstate, GEICO and the other Defendants were steering customers away from the Plaintiffs making identical false statements and misleading innuendo, there was a group silence and group failure to point out the shops the Defendants were steering to had <u>significant</u> complaints lodged against them, such as Service King in Jackson, who left Ms. Desai's vehicle unsafe to drive.

363.     Also significantly, none of the Defendant insurers ever actually identified a single instance of wrongdoing or malfeasance by any of the Plaintiffs they were defaming, not even with an example that omitted personally identifiable information.  They merely stated to consumers who had notified the Defendant insurers of their intent to patronize the Plaintiffs that these bad acts were occurring.

364     The statements made by the Defendant insurers to interfere in the business relationship, established or prospective, between the Plaintiffs and the individuals discussed above were all false.  The statements withheld by the Defendant insurers about their network and preferred shops, poor and incomplete repairs leaving vehicles unsafe to drive, were all true.

365.     It would be absurd to suggest the Defendants simply forgot the truth about their own preferred shops but remembered falsehoods about non-network, target shops.

366.     It would be equally absurd to suggest that Defendants were unaware of the problems and reputations of the various network/preferred shops.  The vast majority of them share DRP shops. Service King, for instance, is a DRP shop for Defendants Progressive, Allstate, GEICO, USAA and Shelter (even though Shelter has purportedly disbanded its DRP).

367.     The only reasonable conclusion from these facts is the named Defendants shared

information about and specifically targeted as a group the particular shops who refused to comply with Defendants fixed pricing structures, parts procurement rules designed to minimize cost and general belief the body shops should simply be quiet and do as they are told by the insurance industry.

368.     Given the identical nature of the false statements made by numerous Defendants, it is also only rational to conclude the high probability of prior agreement as to the most effective statements to make to successfully steer customers away from the targeted shops.

369.     Defendants actions were intentional, coordinated, relied upon shared information and utilized identical methods and content.  Defendants actions damaged Plaintiffs' business reputations and caused substantial pecuniary harm to each as a result of those same actions.

370.     Defendants actions violate both state and federal law.

371.     Known instances of coordinated steering efforts by and between the Defendants as set out above reasonably support the high likelihood discovery will uncover additional instances of coordinated group efforts to boycott specific body shops with the intent to cause specific harm to the Plaintiff body shops.

**OPPORTUNITIES FOR DEFENDANTS TO CONSPIRE**

372.     Opportunities for individuals sufficiently high enough within the Defendants' corporate structure to make or influence substantive decisions exist in abundance.

A.     Trade Associations

373.     Currently available documentation establishes that every national insurer and the vast majority of regional insurers belong to at least one of the three major insurance industry trade associations:

- American Insurance Association (AIA) : Defendants Farm Bureau, Safeco, United Services Automobile Association, and USAA are all members of the AIA. In addition to general membership, from time to time over the course of at least ten years, Defendants Safeco and USAA have all served in positions of authority within the AIA, including the AIA Board.

- The Property Casualty Insurer Association of America (PCI): Defendants Allstate, Progressive, Shelter, Mississippi Farm Bureau through its parent company, GEICO, Southern Farm Bureau, are all members of PCI. In addition to general membership, from time to time over the course of at least ten years, these Defendants have all served in positions of authority within the PCI, including the PCI Board.

- The National Association of Mutual Insurance Companies (NAMIC): Defendants Nationwide and State Farm are members of NAMIC. In addition to general membership, Nationwide and State Farm have, from time to time over the course of several decades, served in positions of authority within NAMIC, including the NAMIC Board.

374.    The members of the companies representing these Defendants on the respective boards, in positions of authority and at general meetings are almost exclusively within the highest tier of executive level at each Defendant insurer company.

375.    For instance, GEICO CEO and Chair Tony Nicely has frequently assumed a position on the board of PCI. Others who have served over the years include but are not limited to Allstate's president, chairman and CEO, Thomas Wilson.

376.    As Nationwide and State Farm have both been members of NAMIC since at least 1961, the list of executives of both companies who have served on the board of NAMIC and its various executive committees is extensive.

377.    Board meetings and other leadership obligations regularly bring the high ranking members of Defendants' companies together, specifically for the purpose of discussing insurance issues, how to advance insurance interests, lobby for legislative favor and generally increase the profitability of the insurance industry.

378.    The associations frequently act in concert, bringing the members and boards together as well, also specifically for the purpose of advancing the insurance industry.  For instance, the associations work together to prepare and present a joint statement on Senate Regulatory Reform Legislation, lobbying Congress to renew the Terrorism Risk Insurance Act, as well as the annual P/C Insurance Joint Industry Forum.

B.    Insurance Institute of Highway Safety

379.    The Insurance Institute of Highway Safety (IIHS) is described as "an independent, nonprofit scientific and educational organization dedicated to reducing the losses - deaths, injuries and property damage - from crashes on the nation's roads."

380.    This organization asserts that among other things, it conducts scientific tests upon vehicle crash worthiness and crash avoidance and rates the results, information which is often well publicized as a selling point in advertising the safety of a vehicle, or of a crash part.

381.    All Defendants are members of IIHS, either directly or through membership of their parent corporations.  Current members of the board of directors include:


•    Defendant Shelter's executive vice president and treasurer, Dan Clapp;
•    Defendant Direct General's president and CEO, John Mullen,
•    Defendant GEICO's vice president and legislative counsel, Hank Nayden.;
•    Defendant Progressive's David J. Skove, general manager, South Region;
•    Defendant State Farm's Angela Spark, vice president and actuary;
•    Defendant Nationwide's association vice president, consumer safety, William Windsor, Jr.


382.    Not only does membership and board membership provide the vast majority of the Defendants (including all national insurers) with additional opportunities to meet and arrange agreements, goals, expectations and mutually beneficial plans, but the organization itself is

influential in establishing the legitimacy of parts, including aftermarket parts as safe alternatives of like kind and quality to OEM parts.

383.    As discussed above, all of the Defendants regularly and routinely compel purchase and use of aftermarket and other non-OEM crash parts for use in the repairs for which each is financially responsible.    The organization therefore provides combination and conspiracy opportunities and incentives for multiple avenues of mutual interest and profit to the Defendants.

C.    CAPA

384.    CAPA, the Certified Automotive Parts Association bills itself as a non-profit organization established in 1987 to develop and oversee a test program guaranteeing the suitability and quality of automotive parts.    Specifically, aftermarket parts.

385.    When either the insurance industry or the collision repair industry discusses parts certification, almost exclusively the reference is to CAPA.    CAPA purportedly sets quality standards and conducts studies of aftermarket parts.

386.    What is generally not discussed is that CAPA was founded and predominantly funded by representatives of the insurance industry, including Defendant State Farm,  specifically for the purpose of reducing collision repair costs.

387.    Current Board of Directors for CAPA include State Farm, Allstate, and GEICO, Clark Plucinski, President of the Boyd Group, which operates the Gerber Collision repair shops (and DRP shops for Allstate, State Farm and GEICO), Tim Adelmann of ABRA, Inc., another multi-state operator collision repair shop like Gerber (and also DRP shops for Defendants State Farm,  Allstate, GEICO, USAA, Nationwide and Progressive.

388.    As with membership in the IIHS, board membership for CAPA provides not only

additional opportunities to meet and arrange agreements, goals, expectations and mutually beneficial plans by and between the largest property casualty insurers in the United States but CAPA is a crucial cog in its well-established corporate policy of purchasing less expensive aftermarket parts whenever possible.

389. The Defendants have gone to great lengths over many years to convince the public and various state agencies of the safety and interchangeability of aftermarket parts with OEM parts. Acceptance of this premises is directly financially beneficial to the Defendants as it provides immediate reward in the form of drastically reduced claims they must pay out.

390. The impartiality of CAPA, as the creation of the insurance industry, financed by the insurance industry and openly working toward the insurance industry goal of reduced claims costs, is worthy of gaze with a weather eye. This healthy skepticism is assisted by the substantial number of aftermarket parts CAPA de-certifies because they are of too poor quality to be in the stream of commerce.

391. It is important to remember de-certification removes certification from aftermarket parts CAPA has already purportedly studied, tested and pronounced as quality collision repair parts.

392. Last year, CAPA de-certified over a thousand aftermarket parts, many of them crash and safety parts, many of them for the most popular vehicles in the country, including hoods and fenders for Toyota Camrys, fenders, hoods and headlamp assembly for Honda Accords, headlamp assemblies for Subaru Outbacks, hoods for the BMW 3-Series, hoods, bumper covers, fenders and fog lights for BMW 5-Series, radiator supports for Dodge Chargers, Ford Edge, Ford Focus, Lincoln MKX, Mazda 6, Nissan Altima, Volkswagen Jetta and Honda Civic, among many others.

393. Through this organization, the largest insurers representing the Defendants' mutual

interests are in a position to not only make agreements affecting the body shop payment structure but to ensure a generous supply of thousands of inexpensive, imitation aftermarket parts is available for the Defendants to compel purchase to further reduce the money they must pay out as claims and thereby substantially profit each Defendant.

## MOTIVE TO CONSPIRE

394.     Each of the Defendants has an obvious motive to agree, combine and conspire to fix prices, boycott and punish noncompliant shops and interfere with Plaintiffs' businesses at every possible level.  Profit.

395.     If the profits were minimal, the value of such a combination or agreement would be questionable.  However, the profits are not minimal.

396.     In 2013, State Farm reported a net income increase of 63%, resulting in a record high net worth of $75.9 billion.  Its underwriting gain was announced at $230 million.

397.     Allstate reported a 2013 net income of $2.3 billion dollars.

398.     GEICO reported 2013 profits of $1.1 billion..

399.     Progressive reported 2013 net income of $1.16 billion.

400.     USAA reported 2013 net income of $2.7 billion dollars.

401.     Without even considering the remainder of the Defendants, these amounts can be placed into perspective: Five of the six top market share holders in the State of Mississippi had higher net incomes in 2013 than the gross national domestic product of eight African countries combined.  It is represents more money than was spent on the entire defense budget by Oman, Jordan, Afghanistan, Venezuela or Pakistan in 2013, none of which are generally known as peaceful havens.

402.     Additionally, the Defendants have a direct opportunity to substantially affect and increase their respective bottom lines.

403.     In insurance industry parlance, the "float" is the monies collected by insurers as premiums that are not–or not yet– obligated for payment of claims or operating expenses.  Rather than just sitting on the float, an insurer is free to invest it and pocket the profit from those investments.  Documentation publicly available shows the majority of the named Defendants invest through BlackRock, Inc.

BlackRock and Service King

404.     BlackRock, Inc. ("BlackRock"), is the largest asset management firm in the world. BlackRock also engages in private equity investing, purchasing ownership interest in companies. BlackRock boasts on its website that it manages $4.32 trillion in assets, manages 7,700 portfolios and has twenty of the top twenty-five insurers as its investors.

405.     BlackRock holds majority ownership of Service King, a collision repair multi-shop operator ("MSO").  BlackRock purchased majority ownership of Service King from private equity and asset management firm, Carlyle Group, which retains minority ownership.

406.     Service King, in turn, owns MSO Sterling Collision Centers ("Sterling").  Service King purchased the collision centers from Defendant Allstate.  In *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2007), Allstate's ownership of body shops (Sterling) was found to violate a Texas state law prohibiting (among other things) insurers from owning repair facilities (affirmed, *Allstate Ins. Co. v. Abbott*, 2007 U.S. App. LEXIS 18336 (5th Cir. Tex., Aug. 1, 2007)(cert. denied, *Allstate Ins. Co. v. Abbott*, 128 S. Ct. 1334, 170 L. Ed. 2d 66, 2008 U.S. LEXIS 1297 (U.S., Feb. 19, 2008).

407.     Defendants State Farm, Allstate, Nationwide, USAA, SAFECO, and GEICO[33333] are all invested in or through BlackRock.

408.     Thus, these defendants, and their subsidiaries, obtain a two-fold profit by steering customers to MSOs owned or controlled by BlackRock: a front-end profit is made by the Defendants through the suppressed payment of costs for repairs to Service King, which these MSOs are willing to accept in return for the volume business resulting from steering.  The insurer Defendants pay out less on a claim as an initial matter.

409.     These Defendants also reap a back end benefit via their investment through BlackRock.  The more cars the MSOs repair, the greater the return on the investment.  Thus, claims payments made to Service King are, in essence, financially a wash, as dollars spent on claims paid to Service King return to the insurance investors as investment profit.

410.     The Defendants reaping these "coming and going" profits include, but are not necessarily limited to State Farm, Allstate, Nationwide, GEICO, USAA, and Safeco.

411.     Based upon information and belief, discovery is likely to reveal the remaining defendants similarly hold investment through BlackRock and therefore directly profit from steering to investment portfolio holdings, including Service King collision repair centers.

BlackRock and Paint and Materials

412.     BlackRock, via one of its numerous investment vehicles, BlackRock Institutional Trust Company, N.A., (referred to collectively as "BlackRock") owns a significant amount of shares in PPG Industries ("PPG"), which manufactures and sells automobile paint used in the collision

_____

[33333]Swiss Re is one of BlackRock's larger institutional investors.  GEICO's ultimate parent company, Berkshire Hathaway, owns 3.01% of voting rights in Swiss Re.  BlackRock owns approximately 10.04% of voting rights.

repair industry. As of September, 2014, BlackRock was the third highest shareholder of PPG, owning 5.7 million shares.[333333]

413. Upon information and belief, PPG offers substantial discounts to MSOs and non-MSO shops which are members of DRPs, sometimes up to seventy percent (70%).

414. Upon information and belief, PPG withholds these substantial discounts from non-DRP shops.

415. These discounts encourage purchases by the MSOs and DRP shops. At the same time, Defendant insurers, particularly but not limited to GEICO and Nationwide which cap paint and materials payments, refuse or reduce payment to Plaintiff shops for paint, stating the charges are excessive because other shops, i.e., MSOs and DRP shops, are able to perform paint tasks for less money and the paint cap imposed is therefore reasonable.

416. Defendants and their subsidiaries holding investments in or through BlackRock obtain a two-fold profit by steering customers to MSOs and DRPs. On the front end, Defendants are able to suppress and reduce claim payments related to paint and paint materials on the ground that costs above their caps are out of line with "the market," thereby retaining funds they would ordinarily have to pay out as claims.

417. On the back end, Defendants who invest with or through BlackRock profit through increased sales of the products manufactured and sold by the company in which they have invested, PPG. Therefore claims payments made to MSOs for paint and paint materials are, in essence,

---

[333333]BlackRock's share ownership in PPG has varied but overall has steadily increased over the last several years, nearly doubling since June, 2011, when it owned 3 million shares. This increase in share ownership coincides with BlackRock's growing acquisition of MSO facilities, such as Service King.

financially a wash, as dollars spent on claims paid return to the insurance investors as investment profit.

418.    The Defendants reaping these "coming and going" profits include, but are not necessarily limited to State Farm, Allstate, Nationwide, GEICO, USAA, and Safeco.

419.    Based upon information and belief, discovery is likely to reveal the remaining defendants similarly hold investment through BlackRock and therefore directly profit from steering to shops using PPG paint via their investment portfolio holdings.    ,

BlackRock and Parts

420.    BlackRock also owns a substantive portion of LKQ Corporation ("LKQ") stock (8.55 million shares).  LKQ Corporation is a leading supplier/seller of "recycled" (i.e., salvaged from junk yards) auto parts.  LKQ's subsidiary, Keystone Automotive Industries, Inc., ("Keystone") is the largest supplier of aftermarket (i.e., counterfeit) parts in the United States.

421.    Salvaged and aftermarket parts seldom fit properly, as discussed in detail above.  However, every named Defendant in this cause writes repair estimates specifying the purchase of repair parts from LKQ and/or Keystone.[3333333]

422.    This is required even when a particular insurer's on-the-ground adjuster or estimator is fully aware a part is not available through either LKQ or Keystone.  The adjuster or estimator will still write the estimate for use of those parts.

423.    When a Plaintiff shop either refuses LKQ or Keystone parts, or none is available in a timely manner and must therefore be purchased from another source, the Defendants refuse to

---

[3333333]Depending upon the type of repair being performed, parts from either or both LKQ and Keystone may be required.

compensate Plaintiffs for anything more than the part could have been purchased (either in reality or theoretically) from those sources.

424. Defendants and their subsidiaries holding investments in or through BlackRock obtain a three-fold profit from these actions. One, Defendants are able to suppress and reduce claim payments related to parts purchases, thereby immediately retaining funds that would otherwise be paid out on claims repairs.

425. Second, Defendants generally refuse to pay labor and other costs associated with modifying salvaged and/or aftermarket parts to fit a vehicle, although use of such parts is entirely at the direction and insistence of the Defendants. Defendants thereby retain funds which should be paid out on claims repairs.

426. Third, Defendants who invest with or through BlackRock profit through increased sales of the products sold by the companies in which they have invested, LKQ and its subsidiary, Keystone. Therefore claims payments made for parts purchases from LKQ and Keystone are, in essence, financially a wash, as dollars spent on claims paid return to the insurance investors as investment profit. The Defendants reaping these tripartite profits include, but are not necessarily limited to State Farm, Allstate, Nationwide, GEICO, USAA, and Safeco.

427. Based upon information and belief, discovery is likely to reveal the remaining defendants similarly hold investment through BlackRock and therefore directly profit from parts purchase specification to investment portfolio holdings, including LKQ and Keystone.

Necessity of combination or conspiracy

428. Although several of the largest Defendants are known investors of or through BlackRock, in the absence of group agreement, the profit motive would not be worth the effort in

the absence of a combination or conspiracy amongst the Defendants.

429.     A single insurer engaging in the actions described in this Complaint would generate such a small effect upon the large investments of the Defendant insurers that it would not noticeably alter investment returns.  The more insurers who participate in steering, compulsory parts purchases and paint cost manipulation, the greater the substantial profit for all.

**IN THE ABSENCE OF AN AGREEMENT AMONG THE DEFENDANTS, THEIR ACTIONS WOULD INDIVIDUALLY BE CONTRARY TO BEST INTERESTS**

430.     If taken individually, the Defendants' actions would be contrary to their own best interests.  Such actions would substantially harm a lone Defendant.

431.     An auto insurer's mandate is to insure risk and, when that risk is realized, to pay the loss incurred.  An auto insurer which regularly fails or refuses to pay for full and complete repairs to vehicles, insists on using salvaged or imitation parts, or in any fashion left a vehicle unsafe or noticeably less safe to operate would very likely soon find itself losing its customers to other insurers.

432.     This is particularly so in a world of instant communication; people like to share and they are able to share with the entire world in the push of a Twitter button or Facebook post. Stories of failure to repair and just as complete lack of concern by the insurer as related above, would substantially damage both the reputation and the viability of the business as a going concern.

433.     The overwhelming power exerted by the group of Defendants allows the evidenced scheme to succeed.  While one or two Defendants leaving the group could find stability or even marginal additional success as the companies who care and pay for proper

repairs, the remainder would far outstrip the minority in sheer profits.

## EFFECTS ON COMPETITION IN THE BODY SHOP INDUSTRY

434.     Defendants actions have effectively removed all competition from the collision repair industry and constitute an unreasonable restraint of trade.

435.     While it may certainly be said the Defendants actions have achieved great effect for the insurance industry, particularly in the area of financial profit, it cannot be said Defendants actions have in any fashion stimulated competition in the collision repair industry. Whether competition between insurers is robust is irrelevant, whether the insurance industry has benefitted from its illegal actions is irrelevant. Considering that would be very much the same as suggesting a thief who has profited by his deeds justifies the loss to the victim and is therefore excused.

436.     The Plaintiff body shops are not in competition with the Defendants. As traders within an identifiable market product, auto collision repair, the effect of competition between collision repair shops is the only effect to be measured.

437.     In the present case, there is no competition whatsoever. Competition presumes a free and open market, where innovation is encouraged. That is not the present state of the body shop industry. There have been no economies or efficiencies created within the body shop industry, nor have prices decreased as a result of a dynamic market, nor incentives created.

438.     The Defendants fix price ceilings for the Plaintiffs, as well as all other body shops. The Defendants generally leave a particularly fixed price structure in place for several years in a row. The determined "market" or "prevailing" rate for the State of Mississippi was $42.00 per hour body labor for at least two years.

439.     Attempts at expansion are not rewarded, investments in capital equipment is risky, though necessary as federal guidelines regarding gas mileage minimums continue to rapidly evolve the physical structure of vehicles, requiring new equipment, new training and substantial investment.

440.     Consumers have not benefitted by the absence of collision industry repair competition.  To the contrary.  As shown above, the repair shops to which the Defendants encourage patronage quite often do extremely poor work, very dangerous work and a consumer is left is a worse position than whence begun.  Quality is not encouraged nor even necessary as the fixed prices/ punishment system created and perpetuated by the Defendants as a concerted group rewards the worst body shop at the same level as the very best.

441.     Certainly some body shops are successful.  But negative effects on competition are not weighed and measured by the effect on competitors, but on competition.

442.     In this case, the Defendants violations of state and federal law have effectively eradicated competition in the body shop industry.  The Defendants actions have had a wholly detrimental effect on the body shop industry and are detrimental to the public.

### INTENTIONAL NATURE OF DEFENDANTS' WRONGFUL CONDUCT

443.     In 1963, a consent decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon complaint filed in the Southern District of New York.  The allegations of that complaint included violations of Sections 1 and 3 of the Sherman Act, also known as the Sherman Antitrust Act.  A copy of this Decree is attached hereto as Exhibit "3."

444.     Specific actions supporting those allegations included: (1) requiring repair rather

than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts; (3) obtaining discounts on new replacement parts; (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused. The complaint further alleged a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

445. The Consent Decree order provided the following relief: (1) enjoined the defendants from placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

446. The clear terms of the Decree apply to and are binding upon "each defendant and upon its officers, directors, agents, servants, employees, committees, successors and assigns, and upon all other persons in active concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise."

447. Many of the named Defendants are members of the contemporary associations which are still bound by the Consent Decree's terms.

448.     1963 Defendant Association of Casualty and Surety Companies merged with the American Insurance Association ("AIA") in 1964 to form the "present-day AIA."

449.     As the successor organization upon completion of the merger in 1964, the terms and requirements of the 1963 Consent Decree are binding upon and enforceable against the AIA and its members, and all other persons in active concert or participation with the AIA, whether or not an actual member of the AIA.

450.     1963 Defendant American Mutual Insurance Alliance became the Alliance of American Insurers in 1977 when membership was opened to stock and other non-mutual insurance companies.  The Alliance of American Insurers subsequently merged with the National Association of Independent Insurers to form the present-day Property Casualty Insurers Association of America ("PCI").

451.     As the successor organization upon completion of all mergers to date, the terms and requirements of the 1963 Consent Decree are binding upon and enforceable against the PCI, its members, and all other persons in active concert or participation with the PCI whether or not an actual member of the AIA.

452.     1963 Defendant National Association of Mutual Insurance Companies ("NAMIC") remains intact and active to the present day.  The terms and requirements of the 1963 Consent Decree are binding upon and enforceable against NAMIC and its members, and all other persons in active concert or participation with the NAMIC, whether or not an actual member of NAMIC.

453.     As noted above, all but one of the named Defendants are known to be members of these organizations and are directly bound by the terms of the 1963 Consent Decree.

454.     Defendant Direct General is acting in active concert and participation with the remaining Defendants, has knowledge of the 1963 Consent Decree and it is therefore bound by the terms and conditions of the Consent Decree, whether or not it is a member of any of the associations.

455.     However, upon information and belief, discovery will likely uncover Defendant Direct General's membership in one or more of the three applicable trade associations.

456.     Defendants actions violate the terms of the 1963 Consent Decree by effecting plans, programs or practices which have the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

457.     As such, it can only be said that Defendants were fully aware their actions, plans, programs, and combinations and/or conspiracy to effectuate the same have been willful, intentional and conducted with complete and reckless disregard for the rights of the Plaintiffs.

458.     Defendants are therefore liable to Plaintiffs for punitive damages.

## CAUSES OF ACTION

## COUNT ONE: VIOLATIONS OF THE SHERMAN ACT - PRICE FIXING

459.     The United States economy rests upon open market systems in which vigorous

competition benefits individuals and businesses alike. The federal government has long recognized the necessity of public policies and a regulatory framework designed to foster and protect the free market system from activities that restrict interstate commerce and/or marketplace competition.

460.    The Sherman Act, passed in 1890 as U.S.C. §§ 1-7 and amended by the Clayton Act in 1914 (15 U.S.C. §§ 12-27) functions "not to protect businesses from the working of the market; [but] to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993).

461.    The Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade. 15 U.S.C. §1. Such agreements are illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

462.    Through parallel actions, and\or explicit agreement, the Defendants have formed and engaged in a conspiracy or combination to fix and impose maximum price limits upon the Plaintiffs for their products and services.

463.    The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. *Kiefer-Stewart Co. vs. Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

463.    The Defendants and co–conspirators have engaged in combination and/or conspiracy in unreasonable restraint of trade and commerce in the automobile damage repair industry.

464.    The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile

damage repair costs, automobile material repair costs through coercion and intimidation of these shops as shown by the "market rate" adopted by the Defendants as a group, though none are purported to have access to the survey conducted by only one of them; uniformity of prices fixed across the entire State of Mississippi though the "market rates" are purported to relate to an undefined but specific geographic area; specific statements by the named Defendants adhering to a single fixed price formulated by one member of the combination or conspiracy and adopted by all, uniformity of action in instances where Defendants should not have access to particular information; to wit, State Farm does not publish or make public its survey results, without mathematical value though it is, and the remaining Defendants do not conduct their own purported survey and yet reach the same "market rate" as State Farm.

465.     The Defendants all raise their "market rates" within days of State Farm raising their rates, although, again, these Defendants are not supposed to have access to State Farm's information.

466.     State Farm regularly and routinely seeks to keep what it considers proprietary information, including internal training and assessment manuals, sealed from public view.

467.     The Defendants all utilize and admit the applicability of the body shop industry databases but regularly and routinely ignore the databases in the exact same fashion, i.e, calling the same procedures included operations when the databases say the opposite, denying the applicability of processes and procedures the databases states are necessary repairs, admitting the baseline application of the industry database but failing to conform to that minimum standard, numerous defendants telling different Plaintiffs each is the only one to perform or demand payment for the same set of processes, i.e., seat belt safety checks, detailing for delivery and denib and finesse.

468.     The aforesaid offenses have had, among others, the effect of eliminating competition

within the automobile damage repair industry, elimination of some shops from a substantial segment of the automobile damage repair industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, harming consumer choice and public interests, subjecting repair shops to collective control and supervision of prices by the Defendants and co-conspirators.

469. Neither the Plaintiffs, nor other members of the auto collision repair industry are able to engage in competitive business practices as the Defendants have effectively and explicitly determined what their business practices will be.

470. The United States Supreme Court has held that direct evidence of an agreement is not necessary to establish a violation of the Sherman Antitrust Act. Some factors which have been held a sufficient showing of an agreement in violation of the Sherman Act include parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, FN4 (2007).

471. Defendants actions constitute behavior which is likely not the result of chance, coincidence, independent response to common stimuli or mere interdependence unaided by an advance understanding. Evidence of this include, but is not limited to:

- All of the Defendants fix prices at particular amounts which are unrelated to the actual prices charged by Plaintiffs which Plaintiffs publicly post;
- The prices fixed by Defendants are all below the prices charged by Plaintiffs which Plaintiffs publicly post;
- None of the Defendants save State Farm purport to undertake any survey or other analysis of the prices charged by body shops to determine a going rate in the body shop industry within the State of Mississippi;
- All of the Defendants fix prices at what they claim is the market rate, which is identical to the rate State Farm's flawed methodology claims it to be;
- State Farm does not publish or otherwise make publicly available its survey results yet each of the other named Defendants enforce the same purported "market rate;"

- State Farm's method of determining the market rate is contrived and fabricated and not based on any recognized method of mathematical or statistical analysis;
- All Defendants assert the market rate is the same across the entire State of Mississippi though posted rates show variability as would be expected;
- The likelihood of all Defendants independently reaching the same conclusion as State Farm as to the market rate is statistically impossible, as State Farm creates the market rate from whole cloth, does not account for variability across large distances as in differing population centers;
- All Defendants change their rates immediately following a rate change by State Farm, though, again, none of them undertake any survey or analysis of prices charged by body shops and therefore cannot be cognizant of any purported changes in the market;
- All Defendants change their rates to the same rates as State Farm, though, State Farm does not publish or make publicly available its survey results;
- All of the Defendants have admitted they pay rates in conformity with State Farm rates;
- Defendant representatives from other states have specifically stated that State Farm sends out its survey results to other insurers which prompts changes in the fixed labor rates paid to body shops;
- All Defendants apply the databases in the same fashion, and all exclude payment for the same processes and procedures for the same stated reasons, even when those reasons are contradicted by the databases and the ordinary practices and procedures of the body shop industry.
- Defendant insurers meet regularly and State Farm has disclosed the Defendant insurers discuss and strategize with each other payment of body shop charges at these regular meetings.
- None of the Defendants individually hold a majority of the market share within the State of Mississippi; collectively, the named Defendants control over seventy-five percent (75%) of the insurance market within the State of Mississippi and are able to compel fixed prices upon the Plaintiffs which none would be able to accomplish in the absence of combination or conspiracy.
- Engaging in conduct to keep their conduct secret including, but not limited to prohibiting members of the body shop industry from attending meetings of insurance representatives wherein State Farm explicitly stated body shop labor rates and data base application and payment of procedures were discussed.

472. It is implausible that all of these events occur regularly and over the course of years as the result of chance or coincidence. The only plausible inference from these facts is that the Defendant insurers have agreed and conspired to establish fixed rates within the entirely separate industry of collision repair shops. That these actions are clearly motivated by profit and self-interest

does not make them any less actions taken in conformity with a conspiracy or combination in restraint of trade. In fact, it may be logically asserted that all conspiracies or combinations in restraint of trade are motivated by profit and self-interest. The mere fact that Defendants' conspiracy or combination in restraint of trade may be motivated by profit and self-interest does not make it any less a violation of federal law.

473. Horizontal price fixing is per se illegal. *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2239 (U.S. 2013), *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (U.S. 2007), *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (U.S. 2006). No showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense. Where there is a per se illegal price-fixing agreement, it is no defense that the agreement at issue did not have anticompetitive effects, or that defendant's motives were benevolent. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218 (U.S. 1940)*.*

474. The Defendants' actions individually and certainly collectively have violated federal law and directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

## COUNT II

### VIOLATION OF THE SHERMAN ACT - BOYCOTT

475. The Sherman Act makes every contract, combination, or conspiracy in unreasonable restraint of interstate commerce illegal. 26 Stat. 209, as amended, 15 U.S.C. §1.

476. While most Sherman Act claims are analyzed under the rule of reason standard, some actions pose such a habitual unacceptable risk of restraining trade they are unreasonable *per se*. *Vacation Break U.S.A., Inc. v. Mktg. Response Grp.*, 169 F.Supp. 2d 1325 (M.D. Fl. Tampa Div.

(Mar. 26, 2001).

477.    The United States Supreme Court has repeatedly held that group boycotts are *per se* violations of the Sherman Act.  See, *e.g.*, *United States v. Gen. Motors Corp.*, 384 U.S. 127, 86 S. Ct. 1321, 16 L. Ed. 2d 415 (1966); *Radiant Burners v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S. Ct. 365, 5 L. Ed. 2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 79 S. Ct. 705, 3 L. Ed. 2d 741 (1959); *Fashion Originators' Guild Assoc. v. FTC*, 312 U.S. 457, 61 S. Ct. 703, 85 L. Ed. 949 (1941)(boycott designed to coercively influence trade practices, rather than to fully eliminate boycott victims from the market held still *per se* illegal).

478.    Those decisions that have rejected the *per se* rule generally applied to boycott activity in favor of a rule of reason analysis have been limited to circumstances where the conduct complained of may reasonably be shown to fall outside the rationale of the *per se* rule; that is, where the conduct arguably furthered a public policy goal such as improving market efficiency or increasing healthy competition.  See, *e.g.*, *U.S.A. v. Realty Multi-List, Inc.*, 629 F. 2d 1351 (5th cir. 1980).

479.    Defendants' common scheme herein acts to restrain trade and diminish competition and market functionality for Plaintiffs and consumers.  Whether viewed under a *per se* rule or a rule of reason analysis, Plaintiffs allege herein a restraint of trade in violation of the Sherman Act.

480.    "Boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding or enlisting others to withhold, patronage or services from the target."  *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 541 (1978).  "It does not matter how the end is achieved, if one or more firms is deprived of suppliers or customers (or other essential trade relationships) by concerted action among other firms aimed at keeping the victim

firms from competing, the arrangement is in purpose and effect a boycott. *Id.* at 543 (citing L. Sullivan, Handbook of the Law of Antitrust 231 (1977)).

481.     Each of the Defendants have actively participated in, and gained economic advantage from, a common scheme, agreement, or conspiracy designed to pressure, intimidate, and/or coerce each of the Plaintiffs into complying with the Defendants' price-fixing scheme.  This common scheme constitutes a continuing agreement, understanding, combination, and/or conspiracy to unreasonably restrain trade, so as to limit or exclude Plaintiffs' and customers' participation in the market.

482.     The common scheme involves multiple forms of illegal boycott activity including, *inter alia*, steering actual and potential customers away from Plaintiffs through knowing dissemination of false and misleading statements about Plaintiffs; manipulating delays and obstacles in approving, obtaining and paying for repairs obtained from Plaintiffs; economically coercive threats that use of Plaintiffs' services will incur additional and greater out-of-pocket costs to customers; alteration and manipulation of the Defendants' referral and rating systems to limit or otherwise influence customer access to service providers.  Each of these forms of conduct individually constitutes an unreasonable restraint of trade and a *per se* violation of the Sherman Act §1.

483.     The enlistment of third parties in an agreement not to trade, as a means of compelling capitulation by the boycotted group, long has been viewed as conduct supporting a finding of unlawful boycott.  *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 544-5 (1978).

484.     Defendants have enlisted, and continue to enlist third party consumers in need of auto repairs, as unwitting participants in their common scheme to coerce Plaintiffs and punish Plaintiffs.

485.     Evidence of concerted boycotting by Defendants against insurers includes, but is not limited to, all Defendants making the same false statements, fraudulent misrepresentations and misleading innuendos about Plaintiffs to consumers who have identified Plaintiffs as their intended repair facility; refraining from disclosing quality of repair issues at preferred, compliant shops, such as Service King; timing of boycotting to engage with intentional punishment decided upon by one or two insurers and enlisting the other Defendants into boycotting a particular Plaintiff at the same time.

486.     Defendants are not permitted to condition payment of claims upon use of a particular or specified repair shop. Miss. Code Ann. § 83-11-501. Thus, where a consumer has selected a Plaintiff shop as their repair facility, the Defendants are not free to refuse to deal with that body shop. Thus, while some Defendants do illegally direct claimants and insureds that they are required to use a particular body shop or from among particular body shops, the group boycott is more particularly aimed at doing sub rosa what Defendants are prohibited from doing in an open and explicit fashion.

487.     Defendants' ongoing conduct in furtherance of the common scheme to boycott, and thereby coerce and/or punish Plaintiffs has had substantial negative impact on the Plaintiffs' business practices and relationships, the ability of customers to freely obtain safe and full repairs, and the functionality of the relevant market.

488.     Agreement to boycott is shown by the Defendants knowledge of changed circumstances, i.e., when a Plaintiff has left another Defendants' direct repair program followed by defamatory and misleading statements to drive customers away from the defecting Plaintiff. As this information is not publicly shared, the unaffected Defendants should not have knowledge of the

actions of one shop with which it is not itself even informally associated. But unaffected Defendants do have knowledge and do act upon that knowledge as a concerted group with malicious intent to harm particular plaintiffs.

489.     Agreement of purpose is also shown by the identical nature of the falsehoods and misrepresentations utilized by the various Defendants in their boycotting and steering of customers from Plaintiffs' places of business. The nearly identical nature of the wording leads to a reasonable conclusion that an agreement was reached as to the most effective statements to use to the greatest effect.

490.     The Defendants actions are violations of federal law and have directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue the aforementioned offenses unless the relief requested herein is granted.

## COUNT THREE: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

491.     Tortious interference with business relations occurs when a defendant engages in some act with malicious intent to interfere and injure the business of another. For purposes of this tort, "malice" is defined as acts done with the unlawful purpose of causing damage and loss, without right or justifiable cause.

492.     The Defendants have repeatedly engaged in malicious actions and a course of conduct designed to interfere with and injure the Plaintiffs' business relations and prospective business relations. The Defendants have repeatedly steered (e.g., Kerri Mitchell and Ms. Williams) and attempted to steer customers who have either initiated or verbalized the intent to initiate a business relationship/transaction with a Plaintiff from the Plaintiffs' respective businesses through their repeated campaign of misrepresentation of facts, failure to verify facts damaging or tending to cause

damage to the Plaintiffs business reputations before conveying the same to members of the public, and, inter alia, implications of poor quality work, poor quality efficiency, poor business ethics and practices, and unreliability.

493 . The purpose of these actions was twofold: to punish the specific Plaintiffs who complained about or refused to submit to the various oppressive and unilateral price ceilings the Defendants were enforcing upon them, and to direct potential customers of the Plaintiffs to other vendors who would comply with the maximum price ceilings unilaterally imposed by the Defendants.

494. Malicious intent is shown through the absence of legitimate business purpose in Defendants actions. Without or without the defamatory statements, the Defendants have habitually and in concert paid the amount each pre-determined it would pay for a particular repair. Whether or not a patron visited a noncompliant plaintiff or a fully compliant network shop, the end result was a forgone conclusion for the Defendants and therefore the Defendants actions can only be attributed to malicious intent to harms the Plaintiffs as they had no effect whatsoever on Defendants' interests.

495. Malice is further shown by Defendants failure to notify consumers who have initiated or announced the intention of initiating a business relationship with a Plaintiff of known quality issues or instances of poor repairs of which it has actual knowledge while continuing to notify consumers of false statements about the Plaintiffs, actions which serve no public interest or legitimate business interest.

496. The Plaintiffs have been damaged by the Defendants malicious and intentional actions without privilege and in violation of law. Plaintiffs are therefore entitled to compensation for these damages.

## COUNT FOUR : QUANTUM MERUIT

497.     Quantum meruit rests upon the equitable principle that a party is not allowed to enrich itself at the expense of another. More specifically, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract therefore.

498.     Plaintiffs have performed valuable services and expended material resources with the reasonable expectation of payment\compensation for those services and materials. This is their business. Performing said services and expending material resources benefitted Defendants and Defendant's insured/claimants for whom Defendants are required to provide payment for repairs.

499.     Defendants reserved the unilateral right to give permission for each Plaintiff to commence work until such time and place as they deemed appropriate. Although ultimate authority for such orders lies solely with the consumer, the Defendants asserted they were entitled to certain rights and privileges in advance of work actually commencing to preserve their own rights. Defendants further interfered and inserted themselves into every aspect of the repair process.

500.     Having reserved those purported rights and affirmatively extended permission and direction, the Plaintiffs were reasonably entitled to rely upon the belief an equitable contract had been formed and should be fully performed.

501.     It was and has always been foreseeable the Plaintiffs were not performing labor or providing services and materials without expectation of full payment. Defendants have acknowledged the essential elements of this cause of action and the concomitant obligation to compensate Plaintiffs by making partial payment.

502.     However, Defendants have simply taken the position that full payment may not be made unless they choose to provide it, regardless of any other factor or consideration and having

fully exercised the extent of their rights, they have further enriched themselves at the expense of Plaintiffs by failing to compensate for work performed and materials expended upon the receipt of the Defendants agreement work could commence.

503.     The elements of quantum meruit do not include a requirement that Defendants' determination of whether the <u>amount</u> of payment made was reasonable by their own determination. Mississippi law looks only to whether or not the Defendants were understood under the circumstances to be responsible for paying the bill at all.  See, e.g., *Huber v. Eubanks (In re Estate of Eubanks*), 2015 Miss. LEXIS 83, 24-25 (Miss. Feb. 12, 2015)(whether "under the circumstances, it was understood that the person performing such services expected to be paid by the person sought to be charged.")

504.     As Mississippi law of quantum meruit takes no notice of Defendants' personal beliefs about the reasonableness of payment demanded, and Defendants have admitted all elements of this cause of action through their conduct, Plaintiffs are equitably entitled to receive payment for the materials and services rendered.

## COUNT FIVE: DEFENDANTS HAVE BREACHED THEIR STATUTORY OBLIGATION

505.     Mississippi Code § 83-11-501 holds that no insurer may require as a condition of payment of a claim that repairs to a damaged vehicle must be made by a particular contractor or motor vehicle repair shop; provide that the an insurer shall be required to pay the least amount for repairs that that such vehicles can be properly and fairly repaired by a contractor or repair shop within a reasonable geographical or trade area.

506.     Thus, this statute imposes a two-fold obligation upon insurers: to refrain from

requiring a consumer to use a specified body shop in order to have a claim paid, and to pay for a proper and fair repair.

507.    Defendants have required known customers to have their vehicles repaired at body shops explicitly selected by the respective insurer (e.g., Kerri Mitchell and Ms. Williams) though said customers had identified a Plaintiff as their choice of repair facility and/or actually initiated a business transaction with a Plaintiff.

508.    Additionally, through intimidation, coercion, collusion, boycotts and simple flat refusal, the Defendants have breached their respective statutory obligation to pay for a proper and fair repair. Specifically, the Defendants have failed to provide the necessary proper and fair repairs through:

(A)    refusal to pay and/or fully pay for necessary and required procedures and processes to return a vehicle to its pre-accident condition and thereby failing to pay for a proper and fair repair;

(B)    utilizing used and/or recycled parts in contravention of the repair shops' expert professional opinion in order to save money and thereby compromising the safety of both the driver and passengers as well as all other members of the traveling public, thereby failing to pay for a proper and fair repair;

(C)    requiring shops to purchase replacement parts of unknown manufacture, reliability, and/or quality merely because it is the least expensive option, thereby failing to pay for a proper and fair repair.

509.    Defendants have further violated this statute by asserting in the course and scope of interactions with Plaintiffs that they are only required to pay the least amount to be found for a given repair. This does not account for the second part of their payment obligation, to pay for a proper and fair repair. While Defendants have certainly paid the least amount they could manage for given repairs, whether that amount was sufficient to pay for a proper and fair repair is in controversy. If

Defendants wish to contest this, it would appear to constitute an avoidance or affirmative defense the Defendants must plead and for which each such pleading Defendant would bear the burden of proof.

510.     The Defendants' repeated and ongoing breaches of the statute have caused financial harm to the Plaintiffs, exposed the Plaintiffs to potential liability for damages and\or injuries resulting from failure of improper replacement parts, failure to replace rather than repair parts when appropriate, and failure of poor quality parts of unknown or uncertain provenance.

## PRAYER FOR RELIEF

511.     As a result of the Defendants' actions, Plaintiffs have been substantially harmed and will continue to suffer unless the relief requested herein is granted.  The Plaintiffs therefore pray for the following relief:

A.     Compensatory damages for all non-payment and underpayment for work completed on behalf of the Defendants' insureds and claimants as determined by a jury.

B.     Compensation for the lost revenue through artificial suppression of labor rates as determined by a jury.

C.     Damages sufficient to compensate Plaintiffs for lost business opportunities as determined by a jury.

D.     Treble damages, reasonable attorneys' fees and costs  for violations of the Sherman Act, as required under 15 U.S.C. § 15.

E.     Injunctive relief prohibiting the Defendants from further engaging in any of the following:

(1)     Placing into effect any plan, program or practice which has the purpose or effect of:

(a)     directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff

to automobiles.

(b)     fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

(2)     Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiffs to participate in any parts procurement program.

(3)     Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

(4)     Prohibiting Defendant State Farm from altering or amending any Plaintiff response to its market labor rate "survey" without the express written permission of the affected Plaintiff.

F.     Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and deter each Defendant and similar entities from pursuing this improper conduct in the future.

G.     Pre- and post-judgment interest.

H.     Any additional relief the Court deems just and appropriate.

## CONCLUSION

While this matter has many aspects and trade terms, the essence of Plaintiffs' claims is simply this:

In the American marketplace there are two types of body shops. There are shops who strive to serve the customer, the owner of the car, and there are those shops who believe the insurance company is their customer. The defendants have successfully created a "market" system that rewards the body shops that will cut corners so they can increase profits and punishes body shops who are

unwilling to compromise the quality or safety of the American consumers' repair.

The whole intent of antitrust actions was and is to increase competition for the sole benefit of the American consumer. Defendants' actions have violated the letter and the spirit of the law. Instead of providing the best quality repairs for the lowest cost they have fixed the costs to their utmost benefit and forced the market into a race to the bottom in terms of quality to the customer.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demands a judgment against all Defendants in an amount sufficient to fully compensate Plaintiffs for damages incurred as a result of Defendants' conduct with appropriate pre- and post-judgment interest, equitable relief as set forth above, punitive damages, attorneys' fees, expenses, costs and any other relief the Court deems the Plaintiffs entitled.

Respectfully submitted, this the 21st day of March, 2015.


CAPITOL BODY SHOP, INC., et al

BY:   /s/ *Allison P. Fry*
JOHN ARTHUR EAVES, JR.
ALLISON P. FRY
WILLIAM R. SEVIER

John Arthur Eaves,
Attorneys at Law
101 N. State Street
Jackson, MS 39201
Telephone:     601.355.7961
Facsimile:     601.355.0530

JohnJr@eaveslaw.com
Allison@eaveslaw.com
Will@eaveslaw.com

Attorneys for the Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing *Plaintiffs' Second Amended Complaint* was filed electronically on the 21st day of March, 2015. This filing will be served upon all ECF-registered counsel by operation of the Court's electronic filing system. Parties and counsel may access this filing through the Court's system.

*s/ Allison P. Fry*

Allison P. Fry