# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

CAPITOL BODY SHOP, INC., et al.,

      Plaintiffs,

v.                                                                    Case No: 6:14-cv-6000-Orl-31TBS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, et al.,

      Defendants.

_____

## ORDER

This matter comes before the Court on motions to dismiss (Doc. 89, 90, 92) filed by various groups of Defendants, the response in opposition (Doc. 98) to those motions filed by the Plaintiffs, and the replies (Doc. 99, 101, 103, 104) filed by the movants.   The portions of those motions having to do with the Plaintiffs' state law claims have been referred to Magistrate Judge Smith for disposition by way of a report and recommendation.   Accordingly, this order will address only the portions of those motions that deal with the Plaintiffs' claims under federal law.

## I.       Background

The instant case is one of 24 similar actions, consolidated for pretrial purposes, in which auto repair shops in a particular state have accused insurance companies of violating Section 1 of the Sherman Antitrust Act and various state laws by conspiring to suppress the amounts they are obligated to pay for automobile repairs.   The lead case among these actions – henceforth, the "Florida Action" – was filed in this court in February 2014.   The initial complaint in that case was dismissed *sua sponte* in June 2014 on the grounds that it was a prohibited "shotgun" pleading, that it

failed to properly set forth the basis for the Court's jurisdiction, that it failed to identify which parties had ongoing contracts with one another, and that all of the alleged misdeeds were attributed, collectively, to every Defendant, even where such collective attribution made no sense.   (Doc. 110 at 1-2 in Case No. 6:14-cv-310-Orl-31TBS).

The plaintiffs in the Florida Action filed an amended complaint later that same month. (Doc. 167 in Case No. 6:14-cv-310-Orl-31TBS).   Subsequently, various defendants moved to dismiss.   In January 2015, this court granted those motions in part, dismissing all the claims in the Florida Action, some with prejudice.   (Doc. 291 in Case No. 6:14-cv-310-Orl-31TBS).   The Sherman Act claims in that case – one for price-fixing, and one for an illegal boycott – were dismissed because the Florida Action Plaintiffs had failed to adequately plead the existence of an agreement and had failed to adequately allege a concerted refusal to deal, respectively.   (Doc. 291 at 20-21 in Case No. 6:14-cv-310-Orl-31TBS).   After another amended complaint and another round of motions to dismiss, the Court dismissed the Florida Action with prejudice in September 2015.   (Doc. 341 in Case No. 6:14-cv-310-Orl-31TBS).   In regard to the antitrust claims, the court again found that the plaintiffs had failed to adequately allege the existence of an agreement or a concerted refusal to deal.   (Doc. 341 at 20-21 in Case No. 6:14-cv-310-Orl-31TBS).   The plaintiffs in the Florida Action did not appeal that dismissal.[1]

The instant case was filed in the United States District Court for the Southern District of Mississippi in January 2014.   (Doc. 1).   In March 2014, the Plaintiffs filed an Amended Complaint.   (Doc. 3).   The United States Judicial Panel on Multidistrict Litigation transferred the case to this Court in August 2014, along with a number of pending motions to dismiss.   (Doc. 76).

---

[1] As of the date of this order, of the 24 actions in these consolidated proceedings, the Florida Action and five others have been dismissed and not appealed; one was remanded; five were appealed but had the appeals dismissed for lack of prosecution; and twelve remain pending before this court.

On February 9, 2015, Magistrate Judge Smith entered a Report and Recommendation (Doc. 82) that all of the claims asserted in the Amended Complaint in this matter be dismissed, some with prejudice.   On February 27, 2015, the Court adopted the Report and Recommendation.   The Plaintiffs filed a Second Amended Complaint (henceforth, the "SAC") (Doc. 87); in response, the Defendants filed another round of motions to dismiss, including those that are the subject of this order.

## II.    Legal Standards

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" so as to give the defendant fair notice of what the claim is and the grounds upon which it rests, *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), *overruled on other grounds*, *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A Rule 12(b)(6) motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. *Milbum v. United States*, 734 F.2d 762, 765 (11th Cir.1984). In ruling on a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.1988). The Court must also limit its consideration to the pleadings and any exhibits attached thereto. Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).

The plaintiff must provide enough factual allegations to raise a right to relief above the speculative level, *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1966, and to indicate the presence of the required elements, *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1302 (11th Cir. 2007). Conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal. *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id*. 678, 129 S.Ct. at 1949 (internal citations and quotations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the plaintiff is entitled to relief.'" *Id*. at 679, 129 S.Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

**III.    Analysis**

NO DIRECT EVIDENCE OF CONSPIRACY

According to the allegations of the Second Amended Complaint (Doc. 87), which are accepted in pertinent part as true for purposes of resolving the instant motions, the Plaintiffs are a group of 26[2] Mississippi automobile repair shops; the Defendants are a group of 18 insurers who, collectively, write more than 75 percent of the private passenger automobile policies in that state. (SAC at 1-9, 13).   The Plaintiffs contend that the Defendants have engaged

> in an ongoing, concerted and combined intentional course of action and conduct to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants.

as well as

> an ongoing, concerted and combined intentional course of action and conduct to boycott and tortiously interfere with Plaintiffs' respective business for purposes of coercion, economic duress, retaliation, and

---

[2]  The Second Amended Complaint actually lists 28 plaintiff shops, but it appears that two of them – Plaintiff Roy Rogers Body Shop, Inc. and Plaintiff Auto Works Collision Specialist, LLP – have been removed as plaintiffs.   (SAC at 1).

> to otherwise harm Plaintiffs as well as substantially increasing their own profits by steering customers away from Plaintiffs' business to body shops which comply with the Defendants' fixed prices.

(SAC at 12-13).

The Plaintiffs go on to assert that the Defendants have

> intentionally combined to utilize their aggregated market power to exert control over every aspect of the collision repair industry, including but not limited to price fixing of labor rates, price fixing of replacement parts, compulsory use of substandard or dangerous replacement parts, compulsory use of a parts procurement program which directly financially benefits State Farm Defendants and indirectly benefits the remaining Defendants, boycotting shops which refuse to comply with either fixed prices or use of substandard or improper parts, and interfering with Plaintiffs' current and prospective business relations by intentionally misrepresenting and making knowingly false statements regarding the quality, efficiency and ethical reputation of Plaintiffs' businesses, exerted economic duress and coercion upon both the Plaintiffs to capitulate and upon consumers, including direct threats to consumers to refuse coverage or portions of available coverage if consumers persist in their efforts to patronize Plaintiffs' businesses.

(SAC at 13).

Simply stated, the Plaintiffs complain that all of the Defendants pay Mississippi automobile repair shops (on behalf of the Defendants' insureds or claimants) essentially the same hourly rates for repairs, painting and the like.   Those rates, the Plaintiffs allege, are based on market surveys performed by Defendant State Farm Mutual Automobile Insurance Company and Defendant State Farm Fire and Casualty Company (henceforth, collectively, "State Farm").   (SAC at 10, 33).   The Plaintiffs allege that State Farm manipulates or fakes the survey results, producing bogus "market rates" that are below the rates actually prevailing in the marketplace.   (SAC at 34-37).   State Farm insists that it is only willing to pay these bogus market rates, and the other Defendants insist on paying no more than State Farm pays. (SAC at 34-35).

In addition, the Plaintiffs allege that the Defendants have a list of repair procedures for which they all refuse to pay, even when that particular procedure is recommended by the industry's leading repair-estimating databases, (SAC at 45-48), and that the Defendants insist that the shops use cheaper (and lower-quality) parts when performing repairs, (SAC at 52-55).   Finally, the Plaintiffs contend that when repair shops balk at any of this, such as by trying to raise their hourly rates or utilize higher-quality parts, they are subject to boycotts in the form of having the Defendants' insureds "steered" away from their shops to compliant shops.   (SAC at 68-71).

### A.    Count I – Price Fixing

In Count One, the Plaintiffs allege that the Defendants and unnamed co-conspirators have entered into an agreement "to control and suppress automobile damage repair costs through coercion and intimidation" of the Plaintiffs, all in violation of the Sherman Act, 15 U.S.C. §1 *et seq.* (Doc. 87 at 88).   Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." While § 1 could be interpreted to bar every agreement in restraint of trade, the Supreme Court has long recognized that Congress intended to outlaw only unreasonable restraints.  *See*, *e.g.*, *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 342-43, 102 S.Ct. 2466, 2472-73, 73 L.Ed.2d 48 (1982) (citing *United States v. Joint Traffic Assn.*, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898)). Even where a restraint of trade is unreasonable, it is only prohibited if it was effected by a contract, combination or conspiracy.  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775, 104 S.Ct. 2731, 2743, 81 L.Ed.2d 628 (1984).   Because of this, the "crucial question" in § 1 cases is whether the challenged anticompetitive conduct "stems from independent decision or from an agreement, tacit or express."  *Twombly*, 550 U.S. at 553, 127 S.Ct. at 1964 (alterations and citations omitted).

Conscious Parallelism

As is the norm in antitrust cases, the Plaintiffs here offer no direct evidence that the Defendants have entered into a price-fixing agreement, instead relying on allegations of parallel behavior.   A showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, but it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense.   *Id.* (citations omitted).   Because of this, stating a claim under Section 1 of the Sherman Act requires "a complaint with enough factual matter (taken as true) to suggest that an agreement was made."   *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965.

The actions allegedly taken by the Defendants in this case, such as paying the same labor rates, refusing to pay for the same list of procedures, and requiring the use of lower-quality parts, are not enough, on their own, to constitute a violation of Section 1 of the Sherman Act.   Evidence of conscious parallelism[3] alone does not permit an inference of conspiracy unless the Plaintiff either (1) establishes that, assuming there is no conspiracy, each defendant engaging in the parallel action acted contrary to its economic self-interest or (2) offers other "plus factors" tending to establish that

---

[3]        The Supreme Court has defined conscious parallelism as a "process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions."   *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 113 S.Ct. 2578, 2590, 125 L.Ed.2d 168 (1993). In other words, conscious parallelism is the practice of interdependent pricing in an oligopolistic market by competitor firms that realize that attempts to cut prices usually reduce revenue without increasing any firm's market share, but that simple price leadership in such a market can readily increase all competitors' revenues.

*City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 570 (11th Cir. 1998)

the defendants were not engaging merely in oligopolistic price maintenance or price leadership but rather in a collusive agreement to fix prices or otherwise restrain trade.   *Harcros Chemicals*, 158 F.3d at 570-71.

In *Twombly*, the Supreme Court noted a number of "plus factors," identified by commentators (and the parties in that case) that could support a plausible inference of such a collusive agreement, including: "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties;" conduct indicating "restricted freedom of action and sense of obligation that one generally associates with agreement;" or "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Twombly*, 550 U.S. at 556 n.4 (internal citations omitted).

Thus, in addition to setting out the Defendants' uniform conduct, the Plaintiffs must provide enough factual matter, taken as true, to show that the Defendants took steps that would otherwise have been against their economic self-interest or that tends to show collusion.

> The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief."   A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.

*Twombly*, 550 U.S. at 557.

### Acting Against Self-Interest

The Plaintiffs contend that they have satisfied the requirement of pleading facts that show that a collusive agreement exists among the Defendants because they have alleged that, in addition

to engaging in parallel behavior, the Defendants have taken actions that would have been against

their economic self-interest in the absence of a conspiracy.   Specifically, the Plaintiffs argue that

> If only a single Defendant took the position [of] underpaying for
> repairs, compelling use of substandard and/or dangerous replacement
> parts, failing and refusing to pay for repairs that will return a vehicle
> to pre-accident condition and similar actions, that Defendant would
> find itself losing customers [to] insurers who do pay for full and
> proper repairs utilizing safe and appropriate parts.

(Doc. 98 at 15).

   This argument is simply not plausible.   The "underpaying" which is seen by the Plaintiffs as

ultimately harmful to the self-interest of the Defendants is simply the buyer-side version of the

profit-maximizing behavior described approvingly by the Supreme Court in the *Brooke Group* case

and by the Eleventh Circuit in *Harcros Chemicals*.   (See note 3, *supra*.)   If the oligopoly has

market power – as alleged in this case – then it is consistent with that power for its members to

observe price parity.   The possible eventual loss of customers resulting from such a practice is

nothing more than speculation.   *See Twombly*, 550 U.S. at 567-68 (rejecting argument that

defendants' failure to compete in each other's geographic areas was suggestive of conspiracy to

restrain trade where plaintiff had no support for allegation that such competition would have proven

lucrative and reluctance to expand beyond existing areas could be explained by legitimate

concerns).   *Compare Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir.

2013) (finding that plaintiff successfully pled that defendants acted against their own interests in

refusing to do business with plaintiff, where successful pilot programs showed that participation in

plaintiff's recycling enterprise would have been cost-neutral to defendants and would have

increased sales to defendants' customers).

Plus Factors

The Plaintiffs also argue that the Second Amended Complaint contains numerous allegations that, taken as true, establish the existence of "plus factors" that support a plausible conclusion that the Defendants have entered into a collusive agreement.   For brevity's sake, the Court quotes the Plaintiff's assertions as to each purported plus factor and then addresses each assertion:

> Market Power: Collectively, the named Defendants hold over seventy percent (70%) of the private passenger insurance market within the State of Florida.

(Doc. 98 at 12) (internal citations to Second Amended Complaint omitted).

The Plaintiffs offer no explanation as to how the possession of market power itself can constitute a "plus factor."   The fact that a group of alleged price-fixers possess power in a particular market does not, standing alone, make it more likely that the members of that group have entered into an agreement to fix prices.   While such an agreement would likely be pointless if the participants lacked the muscle to enforce it, the mere (collective) possession of market share is not suggestive of collusion.

> Motive: The Defendants shared a motive to conspire, profit. As the profit in this case reaches the billions of dollars, the motive is substantial.   Additionally, the Defendants substantially benefit through their combination or conspiracy as they jointly profit through their mutual investments through BlackRock, Inc., in the same companies to which they steer business, provide materials at deep discount and otherwise coordinate and act in concert by agreement. Defendants would be unable to achieve the record profits reported without the coordinated and agreed upon actions.

(Doc. 98 at 12) (internal citations to Second Amended Complaint omitted).

The mere desire to make a profit cannot constitute a "plus factor," because conscious parallelism is itself a profit-maximizing behavior.   *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1342 (11th Cir. 2010) ("Jacobs had the burden to present allegations showing why it is more plausible that

TPX and its distributors . . . would enter into an illegal price-fixing agreement . . . to reach the same result realized by purely rational profit-maximizing behavior.").

In addition, because the motive behind most (if not all) price-fixing agreements is to increase profits among the participants, adopting "profit motive" as a plus factor would effectively eliminate any pleading requirements regarding such agreements.   If the existence of a profit motive was enough to make it plausible that the defendants had colluded to fix prices, then essentially every alleged price-fixing agreement would survive a motion to dismiss.

The Plaintiffs' second argument on this point – involving "BlackRock, Inc." (henceforth, "BlackRock") – is difficult to follow.   It appears that the Plaintiffs are arguing (1) that the Defendants are invested in BlackRock, (2) that BlackRock owns some businesses to which the Defendants steer their insureds and to which they provide discounted materials, and (3) that somehow this contributes to the Defendants earning record profits.   This argument fails for numerous reasons.   First, it is simply another version of the profit-motive-as-plus-factor argument, which fails for the reasons set forth above. Second, the details of the financial relationship between the Defendants and BlackRock – an asset management firm – are incomprehensible, especially in regard to how the Defendants might profit from that arrangement.   The Plaintiffs allege that some (but not all) of the Defendants "are invested in or through BlackRock".   (Doc. 87 at 78).   It is not apparent how an entity that has invested *through* BlackRock would profit just because a BlackRock-owned property prospered.   Finally, assuming *arguendo* that the Defendants have an ownership interest in BlackRock (and therefore would share in the profits of a BlackRock-owned business), it is not clear why this would give them an incentive to enter into an agreement to underpay for repairs performed by such businesses, which is the gist of Count I. The Plaintiffs do not allege that the Defendants pay more for repairs performed at BlackRock-owned businesses or permit the use of higher quality parts when repairs are performed there.   Thus, any ill-gotten gains from the alleged price-fixing scheme would come at the expense of BlackRock and/or themselves.

> Opportunity to conspire: The Defendants have numerous
> opportunities to conspire through their membership in trade
> associations (which, in turn, regularly work together), involvement
> with purported beneficent organizations (e.g., IIHS) and similar
> organizations.

(Doc. 98 at 12) (internal citations to Second Amended Complaint omitted).

It is not clear from the allegations of the Second Amended Complaint that all of the

Defendants belong to any of the trade associations or beneficent organizations referred to in that

document, much less that all of them belong to the same association or organization.   Regardless,

participation in trade associations and similar organizations provides no indication of a conspiracy.

*See American Dental Association v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010).

> Uniformity of action by Defendants:
>
> (A) The Defendants all pay the same labor rates, calling it the
> "prevailing rate," though this rate has no correlation to rates actually
> charged.
>
> (B) The Defendants refuse to pay for the same processes and
> procedures required to return a vehicle to pre-accident condition.
>
> (C) The Defendants utilize the same "reasons" for refusing to pay for
> those processes and procedures required to return a vehicle to
> pre-accident condition.
>
> (D) The Defendants raise the labor rate price ceiling in uniformity and
> immediately following a change by State Farm.
>
> (E) All of the Defendants utilize the estimating databases, all refuse to
> pay or permit the same repair processes and procedures in
> contradiction of the databases they use themselves, for the same
> purported reasons (e.g., claim that denib and finesse is an included
> operation when database documentation clearly states to the
> contrary).

(Doc. 98 at 12) (internal citations to Second Amended Complaint omitted).

The Plaintiffs' argument on this point asserts a uniformity of action among the Defendants

that far outstrips the allegations included in the Second Amended Complaint.   For example, the

Plaintiffs argue in their response to the instant motions that the Defendants "all pay the same labor

rates" and that they "raise the labor rate ceiling in uniformity and immediately following a change

by State Farm."  (Doc. 98 at 12).   However, the Second Amended Complaint does not include any

examples of such behavior.   Instead, the Plaintiffs allege such things as

> In mid-October, 2011, State Farm increased its price ceiling for labor
> rates from $42.00 per hour to $44.00 per hour. *Within a few weeks,*
> *Defendants USAA and Shelter* had raised its [sic] ceiling to $44.00
> per hour.

(SAC at 40) (emphasis added).   As the italicized text shows, State Farm's price increase was

matched weeks later by a few of the Defendants – not immediately by all of the Defendants, as the

Plaintiffs assert here.   Similarly, the Plaintiffs allege that

> When State Farm raised its price ceiling to $46.00 per hour in the
> summer of 2012, by autumn, Defendants Shelter, USAA, Safeco,
> Mississippi Farm Bureau, Nationwide, GEICO and Allstate had set
> their respective price ceiling at $46.00 per hour.

(SAC at 40).   Again, the price change was not matched immediately by all Defendants; rather, it

was matched over the course of months by some of the Defendants.   The Court has not uncovered

any instance in the Second Amended Complaint where the Plaintiffs have alleged that the other

Defendants matched a State Farm price change uniformly or immediately.

  The Plaintiffs' other allegations on this point also fall short of the claims made in their

response to the instant motions.   For example, the Plaintiffs cite to a portion of the Second

Amended Complaint allegedly showing that the Defendants "refuse to pay for the same processes

and procedures required to return a vehicle to pre-accident condition" but the cited text has nothing

to do with this issue.   *See* SAC at 41-42.   The Plaintiffs' other allegations regarding the

Defendants allegedly uniform behavior are almost entirely lacking in specifics, and therefore do not

constitute factual allegations from which one can conclude that the behavior was not merely

parallel, but collusive.

<u>Actions that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties:</u>

(A) The State Farm labor rate survey is created from manipulated information, sometimes created out of whole cloth, then "calculated" utilizing a formula which bears no indicia of mathematical/statistical legitimacy.

(B) State Farm does not publish or make publicly available its purported survey results, even going so far as seal such information in other litigation, calling it proprietary, confidential and/or trade secret information.   This is set out in several sections of the SAC, but Defendants continue to argue that competitors are free to make changes in their prices based upon prices offered by the competition. This argument continues to be made despite the fact that the prices in question are considered secret and not published, and are not reflective of competition as the defendant insurers are not in competition with the plaintiff body shops, whose prices are controlled not by a free market but by an entirely separate industry.

(C) None of the Defendants except State Farm even allege they conduct a market survey to determine the purported "market rate," yet each Defendant pays the same rate, claiming it is the "market rate" and that "market rate" is the rate State Farm has created through its manipulated and unpublished "survey" results.

(D) Despite conducting no independent fact gathering or analysis of their own, the Defendants quickly conform to rate changes set by State Farm.

(E) The Defendants rely upon the exact same excuses for refusing to pay for necessary processes and procedures, though those reasons are demonstrably false (e.g., assertions that a particular plaintiff is "the only one" to perform a particular procedure or to bill for that procedure when numerous plaintiffs have performed and/or billed for those same procedures), the reasons are contradicted by the databases the Defendants themselves use.

(Doc. 98 at 12-13) (internal citations to Second Amended Complaint omitted).

Again, the cited allegations do not suggest collusion on the part of the Defendants.   For example, if one assumes that State Farm's survey and the resulting "market rates" are entirely bogus, this would not suggest that the other Defendants entered into a conspiracy to pay no more

than State Farm pays.   The Plaintiffs also argue that the fact that the other Defendants know the prices paid by State Farm indicates collusion, because "the prices in question are considered secret." (Doc. 98 at 13).   However, there are no allegations in the Second Amended Complaint that State Farm tries to keep those prices secret.[4]   The Plaintiffs offer no explanation as to why State Farm would have any incentive to try to keep the rates it pays for repairs secret from its competitors.   And given that those rates would be known by, *inter alia*, every repair shop in the state, it would not appear likely that State Farm could keep them secret, even if they had a reason to do so.

Finally, the Plaintiffs attempt to rely on their allegations that the Defendants, when refusing to pay for certain recommended procedures, uniformly utilize the same explanations.   For example, the Plaintiffs have alleged in the Second Amended Complaint that the Defendants refuse to pay separately for a painting-related procedure known as "denib and finesse," claiming that it is included as part of the paint job, even though industry repair databases identify it as a separate procedure. (SAC at 48).   But the Plaintiffs fail to offer any explanation as to how this indicates collusion on the part of the Defendants, and no such rationale is apparent to the Court. Even if one assumes that the Defendants have agreed to refuse to pay for certain procedures, it defies logic that they would also agree to use the same bogus excuses to justify their refusal.

In light of the foregoing, the Court finds that the Plaintiffs have again failed to state a claim for price-fixing in violation of Section 1 of the Sherman Act.

**B.     Count Two -- Boycott**

In Count II, the Plaintiffs assert that the Defendants have attempted to coerce auto repair shops into going along with their price-fixing scheme by

---

[4] The Plaintiffs do allege that State Farm tries to keep claims handling and payment information secret, SAC at 34 n. 3, but not prices.

> multiple forms of illegal boycott activity including, *inter alia*, steering actual and potential customers away from Plaintiffs through knowing dissemination of false and misleading statements about Plaintiffs; manipulating delays and obstacles in approving, obtaining and paying for repairs obtained from Plaintiffs; economically coercive threats that use of Plaintiffs' services will incur additional and greater out-of-pocket costs to customers; alteration and manipulation of the Defendants' referral and rating systems to limit or otherwise influence customer access to service providers.

(SAC at 94).

The generic concept of "boycott" refers to a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).   The Defendants argue, *inter alia*, that the Plaintiffs' boycott claim must be dismissed because the Plaintiffs have again failed to allege conduct that would constitute a concerted refusal to deal – the same reason their previous boycott claim was dismissed.   *See, e.g.*, Doc. 90 at 16.   At best, the Defendants argue, the Plaintiffs have included in the Second Amended Complaint some allegations of a particular insurer attempting to steer its insured from a shop operated by one of the Plaintiffs to a different shop that had a relationship with the insurer.   (Doc. 90 at 17).

The Plaintiffs do not directly respond to these arguments.   Rather, they argue that 1) the Defendants are not free to refuse to deal with the Plaintiffs, because the choice of repair facilities lies with the insured, not the insurer; 2) the insurers are not sellers, they are only payers; and 3) "refusal to deal" considerations only apply to monopoly claims under Section 2 of the Sherman Act, and the Plaintiffs have not asserted such a claim.   (Doc. 98 at 17).

The Plaintiffs' first two points are unresponsive.   As for the third, it is incorrect.   In the antitrust context, group boycotts, or concerted refusals to deal, may run afoul of Section 1 of the Sherman Act. *See, e.g., Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 625 (1953) *and see F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990) (finding that boycott by

criminal defense lawyers, who refused to represent indigent clients until government increased compensation for doing so, constituted "a classic restraint of trade within the meaning of Section 1 of the Sherman Act").

The Court also notes that there are no allegations in the Second Amended Complaint that any Defendant (much less all of them) has ever refused to do business with any of the Plaintiffs. The Plaintiffs do include allegations that a number of Defendants, on different occasions, had attempted to steer one of their insureds away from one of the Plaintiff's shops to another shop that had some sort of relationship with the insurer.   (SAC at 57-62).   Only a few of these attempts are alleged to have succeeded.   *Id.*   None of them aid the Plaintiffs in stating a boycott claim, however, as none of the efforts are alleged to have involved more than a single Defendant, and there are no allegations that any of the attempted steering occurred because the repair shop originally chosen by the insured was attempting to obtain a higher reimbursement rate or anything of that nature.

The Plaintiffs have again failed to allege a concerted refusal to deal, as required to state a boycott claim under Section 1 of the Sherman Act.

## IV.     Conclusion

This is the Plaintiffs' third attempt to state an antitrust claim. Based upon a review of the pleadings in this and the other 20-odd consolidated cases – the vast majority of which share the same shortcomings – the Court finds that giving the Plaintiffs another opportunity to state a claim would be an exercise in futility. Accordingly, both antitrust claims will be dismissed with prejudice.   In consideration of the foregoing, it is hereby

**ORDERED** that the motions to dismiss (Doc. 89, 90, 92) are **GRANTED** as to the antitrust claims, and Counts I and II are **DISMISSED WITH PREJUDICE.**

**DONE** and **ORDERED** in Chambers, Orlando, Florida on February 22, 2016.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party